Davis, J.,
delivered the opinion of the court:
In August, 1861, a dispute which had arisen between the War Department and the land-grant railroads was settled by a regulation that a special rate of two cents per mile should be allowed the government for passenger traffic, and that the government freighting should be done for such reasonable rates as might be allowed to railroad companies, and that in both cases these rates should be subject to a deduction of 33J per cent, as due to government for charter purposes.
It requires no special familiarity with railroad matters to know that these rates were favorable to the government. The passenger rate was below that charged in many parts of the country, and the agreement as to freights gave the government the benefit of contracts made with connecting lines for through freight.
This arrangement continued in force during the war, and until the 1st March, 1867, -when the Q uar term as ter-General set it aside arid substituted for it a rule of compensation less favorable to the government, by which the latter was to pay the rates, local or through, charged to the public for similar services, subject as before to a discount of 33J per cent.
If it were ndcessary to seek for a reason for this change, it could be found in the increased cost of wages and material caused by the war, and in the diminution of government transportation after the war. For our purposes, however, it is sufficient to say that the new rule worked great changes. As applied to the bills now in suit, it increased the passenger rates *135 more tb.an 150 per cent. Tbe claimants have not furnished their contracts with connecting roads, and consequently the effect of the change on the freight rates cannot be stated.
The defendants, in examining the claimants’ president as a witness, called upon him to furnish copies of the contracts with connecting roads. The witness refused to do this. The Attorney-General thereupon moved the court to compel the witness to answer the inquiry, contending that the government has still the right to participate in the advantages enjoyed by connecting roads under such contracts. We do not think so.We regard the rule of 1861 as terminated on the 1st March, 1867. After the latter date, and until the act of 1874, which will be hereafter noticed, the government was bound to take ordinary rates as the basis of its computation. Since the passage of the act of 1874, a rule has prevailed which makes it unnecessary to inquire into this class of contracts. In the absence of a necessity it would be manifestly improper to make such an examination, and we therefore overrule the. motion.
No special transportation contracts were made with the claimants or with any other land-grant road, either under the old or the new rule. It was the custom to make requisitions for transportation from time to time as it was needed. The transportation was done as asked for, and was charged and paid for according to the rule existing at the time of its performance.
In this way a quantity of transportation was performed by the claimants for the defendants during the year terminating-on the 31st March, 1875. The act of June 16,1874, was enacted while this service was going on, and took effect on the 1st July, 1874. It provided that no money should be paid from the Army appropriation bill of that year to any railroad company for the transportation of any property or troops of the United States over any railroad which in whole or in part was constructed by the aid of a grant of public land, and on condition that such railroad should be a public highway for the use of. the Government of the United States, free from toll or other charge, but that nothing therein contained should be construed as preventing any such railroad from bringing a suit in this court for the •charges for such transportation and recovering for the same, if found entitled thereto by virtue, of the laws in force prior to the passage of that act. (18 Stat. L., 74.) The army appropriation *136 act for the next year made this provision a permanent law.. (Ib., 453.) Thus it remained until the Sundry Civil Appropriation Act of March 3,1879 (Session Laws, third session, Forty-fifth Congress, 390), when authority was conferred to pay the-arrears withheld under the previous acts, to be adjusted by proper accounting officers in accordance with the decision of the Supreme Court: but in no event was more than 50 per cent, of the amount allowed by the Quartermaster-General to be paid until the decision of this court should be had in each case.
. Between 1867 and 1874 there had been a great fall in the cost of wages and material, and some of the causes which had induced the rise in rates in 1867 no longer existed. The act of 1874 may therefore have been caused in part by a dissatisfaction, in Congress with the continuance of the high rates. That body also undoubtedly wanted a decision from the highest court as-to the liability of the government to pay anything for transportation over roads constructed by the aid of grants similar to those made to the claimant. Influenced by such considerations, it put a stop to all payments for such transportation.. Arid when the Supreme Court settled one of the disputed questions favorably to the railroads, in a proceeding which we-shall soon consider, Congress expressed its willingness to settle-the other, so far as pending claims were concerned, on the basis, .of rates recognized by the Quartermaster-General, provided the companies would accept' 50 per cent, of the ordinary tariff rates instead of 66§ per cent., which they had been receiving. But if they would not accept such a rate in full, Congress nevertheless authorized the 50 per cent, to be paid, and left it with, this court to decide, in each case, on the merits of the particular-case, whether the claimant is entitled to more.
We are, therefore, left in no doubt as to the view of the legislative department of the government concerning the worth of' such service as the claimants rendered. It is worth, in the estimation of Congress, 50 per cent, of the ordinary tariff rates-charged by the claimants to the public for similar services.. But that body leaves the courts to determine whether the-claimants, and other companies similarly situated, had earned; a greater compensation in the transportation thus already performed which is referred to in the appropriation act of March. 3, 1879.
• The payment of the services .which we have already referred. *137 to as rendered by tbe claimants for tbe defendants between March 31, 1874, and April 1, 1875, was refused in consequence of tbe passage of the act of June 16, 1874. Tbe claimants then brought suit in this court to recover it. A pro forma judgment was rendered for the defendants, which was reversed above. (93 U. S., 442.) The Supreme Court decided, in effect, that the provision in the land-grant charters which exempts the government from toll applies only to the road and its immovable appendages, and not to the use of the equipment, machinery, and service. This court had found the standing rule in the War Department, already referred to, as one of the facts in that-case, and that it was in force when the service commenced. On that finding the Supreme Court ordered the entry of a decree awarding compensation to the claimants, subject to a fair deduction for the use of the railroad.
On tbe receipt of the mandate this court, in awarding the compensation to the claimants, took into consideration such proof as was offered, and decided that it saw no reasonable ground for setting aside the judgment which had been entered by stipulation; that is, a judgment founded upon the' departmental rule that tbe ordinary tariff rates, less 33¿ percent., should form the measure of the worth of the service.. The court above affirmed this, resting its conclusion not upon the alleged fact that the Quartermaster-General had agreed what the rate should be, but upon the fact that there was nothing to show that the rates fixed by the Quartermaster-General were not equitable and just. It expressly disclaimed a purpose to decide whether, after the passage of the act of June 16, 1874,. the War Department could make an arrangement as to rates which should preclude the courts from considering and determining them.
The service covered by the claim in the present suit extends-from March 31,1875, the close of the service previously sued for, to December 1, 1876. A portion of it, amounting to $5,656.09, is for transportation over branches which are not land-grant roads. No part of this has been paid, and the right to a judgment for it is not contested. There was some contest about the service on the land-grant road. At the claimants’’ ordinary tariff rate-s, tbe transportation bills which were approved by the Quartermaster-General amounted to $170,843.55,, and it is admitted that the Quartermaster-General is of opinion *138 "that tbe service is worth that sum, less 33J per cent, discount :as due the government for charter privileges.
The claimants^ demand, 1st, the amount admitted by the 'Quartermaster-Genera], contending that the continued custom between the parties from 1867 to.1875, fortified as it is by the ■opinion which that officer still maintains, is a controlling ‘element in the case; or, 2d, if we fail to find the amount admitted by the Quartermaster-General to be the reasonable worth ■of the service, then they ask a compensation at their ordinary tariff rates, less 20 per cent, discount for the use of the road, ■contending that they have proved by the testimony of experts that 20 per cent, of gross transportation earnings is a reasonable and proper deduction for that use. They do not seek to xecover either of these sums under an- express contract. They admit that there was no express contract, and they now sue for the reasonable worth of the service which they rendered.
From this recital it appears that we are possessed of the whole case unhampered by any supposed restriction of the act of 1874 upon the power of the Quartermaster-General to make a contract, or by any alleged contract between the Quartermaster-General and the claimants, or by any ruling of the Supreme Court in the former case decisive of this.
If no contract was in fact made by the Quartermaster-General, it is immaterial whether the statute did or did not take .away from him the power to make one. And if when the Supreme Court, in the former case, said that we should award a ■compensation to the claimants in that case for the transportation performed by them “ subject to a fair deduction for the use of their railroad,” it is intended only to give directions how to reach a judgment in that case on the findings of fact, then the precise direction thus given related to that case only, and is not a precedent for our action'in this.
In entering upon an inquiry as to the reasonable worth of the service, two considerations should be borne in mind.
1st. Neither party claims that, in the absence of an agree- . ment as to a rate to be charged, there was a customary rate for ,-such a service, which can be ascertained without mathematical calculations from the general results of the claimant’s operations, or that, in fact, the claimants or any other railroad companies except land-grant companies similar to the claimant have ■carried for parties in that way. If either party could establish *139 such a custom, or find such a customary .rate, it would be an •easy way of disposing of the knotty problem we have to solve.
,2d. The claimants are entitled to recover, and that is what. we have to ascertain, exactly and only what they collect from the public for the*same kind and extent of service. The government is entitled to no favor, and, on the other hand, is not ■to be subjected to wrong. Its statutory contract with the claimants, as interpreted by the Supreme Court, when applied to work like that now sued for, and when the work is done as this was done, with reference on both sides to the rights of the government, obliges it to pay for that work at the claimants’ ordinary tariff rates, through or local, as the hauling may be through or local, less so much of the same as are collected for and applicable to the portion of the claimants’ property which the defendants are entitled to use without charge. It therefore follows that, in so far as the Quartermaster-General assumed the claimants’ ordinary tariff rates as the basis for adjusting the amount of each transportation bill, he acted upon a principle which we must take as our starting point in the decision of this case.
The claimants first contend that the custom which prevailed from 1867 to 1875, and which the Quartermaster-General still regards as the equitable mode of measuring the payment due the claimants, is controlling and conclusive. If this contention can be sustained, it disposes of the case on a question of fact and puts an end to all controversy as to the law; for if it be true as a fact that the claimants are entitled to be paid two-thirds of the tariff rates for the service performed — there being no controversy in law as to the tariff rates or the amount of the transportation — there only remains a calculation which does not require the intervention of the Court of Claims. But when Congress, in 1874, enacted that no money should be thereafter paid to the claimants, but that they could bring suit here to recover for the charges of their transportation, and when, in 1879, it enacted that 50 per cent, of those charges might be paid, but that no more should be paid until a decision could be obtained in this court on each case pending therein, it clearly did not remit the charges to us for the simple purpose of an arithmetical calculation on the audited bills from the Quartermaster-General. On the contrary, Congress, in 1874, not only took away from the Quartermaster-General the power to malee *140 rates for transportation on the lancl-grant roads, but it set aside any conclusions of law or of fact which might be drawn from previous arrangements, and left us to decide the legal principles upon which to determine the settlement of the rates, subject to review above.
The claimants next contend that they have proved by experts that 20 per cent, of the gross transportation earnings of a railroad is a reasonable and proper deduction for the use of the road, and that they are therefore entitled to recover as compensation 80 per cent, of their tariff rates.
This mode of settling what may, for convenience, be called the ultimate fact in this case, is purely conjectural. It seeks to-obtain a general result, derived from the operations of other railroads in the country, and to apply it to the claimants’ road. It proposes that persons specially familiar with railroads and railroad accounts shall arrange these scattered facts, and shall deduce generalizations from them which are to form the basis of our judgment.
If the parties were themselves amicably adjusting a tariff rate, a percentage of earnings would undoubtedly be the most practicable and easy way for fixing it. In case of disagreement they could call in persons familiar with the business, and accept or reject their estimates at pleasure.
Butin judicial proceedings such estimates, when once admitted in evidence, areno longer rejectable at will. An expert’s opinion on ■ a question of art or science is a fact which must be accepted' by a jury, if uncontradicted. Art, in its legal significance, embraces every operation of human intelligence whereby something is produced outside of nature; and the term u science ” includes all human knowledge which has been generalized and systematized and has obtained method, relations, and the forms of law. Because all persons have not leisure or capacity to master the principles of art or science, those who are specially skilled in either are allowed to give in evidence opinions which are received as facts whefi the issues involved make them material, and when they are the best evidence obtainable.
There is nothing mysterious in q contest about the machinery, servants, and equipment of a railroad which calls for an expert to interpret operations or terms of art, or results of science. It is not an unusual thins- in this court to ascertain from the *141 different elements of cost whioli are proved bow mucb an entire service is reasonably worth. It is no disrespect to the experts to say that tlie law regards ns as competent to deal with tlie questions without their aid, and imposes upon us alone the duty of doing so.
Nor have the data upon which their conclusions rest that certainty of relation which entitles them to authority as a law of science. Eailroads differ in their essential features as widely as individuals. No proper comparison can be made between the cost of maintaining a road like the Pennsylvania and its •equipment with that of keeping a road and equipment up when the road is half ballasted, with trestle iu the place of embankments and bridges, with cuttings not brought to slope, with light iron on the track, ■ and with shanties for stations. A devastating flood may pour into the accounts of a single year an aggregate of maintenance of way greater than that of many ordinary years. A long icy and snowy winter may do the same with maintenance of equipment. A great accident may swell to a serious item the usually small percentage of damages to passengers and freight.
The conclusions which flow from these considerations are strengthened when we regard the actual differences between the experts. What is known as the Massachusetts formula gave in the former case as the deduction to be made from ordinary tariff rates for the government’s right to the use of the road about 78 per cent. (12 C. Cls. R., 301.) The opinions of -other experts given in that case varied from 15 to 42 per cent. (Ib., 302.) In the present case the government auditor fixes it at 43.53 per cent. One of the claimants’ witnesses fixes it at 19.4. The Quartermaster-General thought, and still thinks, it is worth 83.( per cent. It was stated in argument that evidence is before a Congressional committee to show that it is worth but 22J- per cent. An easy calculation will show how widely these experts vary from each other, and how great an effect their differences would have upon the result.
These considerations force us to the conclusion that this mode •of estimating and computing damages should not be adopted, unless it is impossible to find a better one.
The percentage of gross transportation charges which is •equivalent to the percentage of gross earnings at the time of the service for which the claimants’ road-bed and fixtures could be *142 leased, tbe lessors making all repairs and renewals, is suggested by tbe defendants as a better rule; and tbey show, as tbe basis of tbe finding wbieb tbey request on that point, that certain roads wbieb are leased and operated by tbe claimants yield to tbe lessors 44.98 per cent, of tbeir gross earnings as rent, and absorb 11.84 per cent, of tbe same for maintenance of way.
This mode of disposing of tbe question is open to even greater objections than tbe one wbieb we have just rejected. A railroad is not a property that can be put into an agent’s hands and rented like a furnished bouse in town. A main line may lease a branch, either to keep it out of tbe bands of a rival or to use it as a feeder. In tbe former case it may be willing to pay a higher rate than its real worth; in tbe latter it may be able, especially if it is tbe only outlet for tbe branch, to force a letting below tbe real worth. In neither case does the biring-sbow, except with a distant approximation, what the main line itself would let for if offered in the market. From tbe very nature of tbe property, such a mode of estimating its value is uncertain, and can be resorted to only when more direct and simple ways fail. If tbe parties had not furnished us with a higher class of evidence, by means of which we can obtain a computation of damages founded apon tbe actual operations of tbe road during tbe period sued for, we should be justified in resorting to this class of proof. But, as higher and more direct evidence is within our reach, we have not felt justified in considering this, although we have embodied its results in our findings.
Tbe problem which we are to solve is to find the amount which the public would pay for a similar service if the public had the same rights which the defendants have.
The findings profess to give us so manj' cents and so many fractions of a cent per mile per passenger or per ton of freight as the cost of the service. The defendants maintain that this-cost is all to which the claimants are entitled; and they further contend that in any event it must be taken as a starting-point, and that only a reasonable profit for doing the work should be added to it.
This mode of computation would involve the abandonment of the principle we have already adopted, to give to the claimants what the public pay them for service of like character and extent. Every one must know that the reported cost of car *143 riage is an average result, obtained from a review of the operations of the road during the period. The carriage was done in the ordinary trains of the claimants. Its cost is so intermingled with the cost of other service that it is impossible to. do more than to assign to this special service its proportionate part of the average cost of the whole during the same period. Even if it had been done for the defendants in separate trains,, and the exact cost of the number of tons of fuel consumed, and of the number of gallons of oil, and of the waste, and of the-wages of the train-servants during the time could be ascertained, Avhich is doubtful, still the claimants would have been obliged in ascertaining the whole cost of the service to estimate the proportionate cost of station and switching sendee, of repairs of cars, of repairs of engines, of general expenses, and of' similar items which are shared with other transportation.
In fact, in every mode of computation the result can be only an approximation 5 but the method which we adopt has this, advantage over those which we have been considering, that it is an approximation founded upon the actual elements of cost which went into the special service, and upon the actual charges made for similar services rendered to the general public, and cannot be far from the exact truth.
We start in the inquiry with an accurate knowledge of what the public does pay for a similar service, without possessing the rights enjoyed by the defendants. The approved and audited bills from the quartermaster, made up at the time each service took place, at. the rates at which individuals were charged for similar sendees, are conclusive on this point. We should find ourselves at sea, without rudder or compass, if we listened to the request of the Attorney-General to cut loose from this mooring, and if we drifted into a general inquiry as to what the rates, ought to have been on the claimants’ road during the twenty months in question.
Assuming the correctness of these bills as to the amount of the service rendered, and as to the rates paid for a similar service by the general public, the gross amount of the claimants’' transportation earnings represents the aggregate of their receipts at tariff rates, just as the sum of all the bills rendered to the defendants and-' approved by their Quartermaster-General represents the aggregate of the transportation done for them at the same rates. From this amount of gross earnings we de- *144 deduct the cost of the maintenance of the way and also the proportion of the net profits which the cost of the road bears to the combined cost of the road and equipment. What remains represents that part of the transportation earnings towards which the rates upon the transportation done for the defendants should compel them to contribute their proportionate part. This proportionate part is to be ascertained by a simple rule of three. As is the sum of the gross earnings to the sum of the service done for the defendants as the ordinary tariff rates, so is the remainder as above found to the sum we are seeking to find.
The first step in the above process is to deduct from gross earnings the cost of the maintenance of way. Tariff rates are established and collected first for the purpose of paying for the actual cost of the transportation, and second in order to remunerate the owners of the property for its service in doing the work. All earnings not consumed in doing the work and preserving the property remain as resulting profits, to be disposed of for the benefit of the owners of the property.
It is apparent that this theoretical division of the receipts of a corporate common carrier calls for the payment of all corporate expenses as part of the cost of transportation, and that its property must be kept from depreciation out of earnings before profits can be earned. But the law, as construed by the Supreme Court, says that no earnings shall be gained by trans-' portation for the defendants for the purpose of maintenance of way, when that transportation is done, as the present service was done, with reference to the defendants’ rights under the statute. For this reason, in this computation we first deduct from gross earnings all expenditures for maintenance of way. We understand by this term not only the outlays for keeping rip the road, the road-bed, the track, the turnouts, the switches, the bridges, the fences, and other structures, and similar property incident to the completed way, constructed for and used as a railroad, but also the outlays upon the stations, water-tanks, and other similar immovable appendages to the road which are necessary to keep them in repair, and the taxes upon the same species of property. We also understand it to include outlays and taxes upon machine-shops and other similar buildings constructed and used for machinery and equipment; because-the defendants, if they operated the road with their own rolling- *145 stock, would have the right to use those structures for keeping their equipment in repair.
We next deduct from what remains of the gross earnings, such proportionate part of the net profits of the road as the cost of the road bears to the combined cost of the road and equipment.
In our division of earnings we have seen that one part goes to pay the cost of earning them. What remains is the net profit or net earnings of the owners of the property. For the purposes of this suit it is immaterial what disposition is actually made of them; whether they go to the payment of debt or of interest on a debt, or to improve the property, or are distributed. We are only to inquire whether any portion of these net results from the imposition of rates goes, in theory, to a quarter which has no right to impose rates upon the defendants. Before doing this, we repeat, in order to give it prominence, the principle that transportation rates are imposed by a railroad company for the purpose of affording a remuneration to capital; for upon this principle hinges this part of the case. It has been obscured by the evidence of the experts; but if the dead mass of a corporation were not interposed, and we were dealing with a living individual, the proposition would be self-evident. An individual transporter in a stage-coach, for instance, demands from the public rates which will not only return to him his outlays, but pay him a profit. He does not divide his profit between his stable and his coach, as some of the experts would have the railroad companies do, but he puts it in his pocket. If he has a partner, they divide it. If one partner has contributed more capital than the other, he gets a proportionate share of the profit. If one contributes more time, knowledge, and experience than the other, he gets his' proportionate reward. If the two partners contract with a third party to transport for him at the customary rates, less the share of the profits which one of the partners would earn, they would have no difficulty in determining, after performance of the service, how much the third party ought to pay.
The present case is to be settled on similar principles. Two species of property are owned by the claimants. They can and do tell us how much each has cost. The defendants have the right to use the one; they have no right to use the other. The two are used together by the claimants for the purpose of earn *146 ing money, and a rate is charged which is intended to enable both to earn money. There is no stipulation that one kind of property is to earn at one rate and the other at another. Both are on an equality. If the two were owned by different proprietors,-and the net profits were distributable according to the capital in each, there would be no room for argument as to our • duty. To us there seems to be as little room for it on the facts presented in the findings. If the public pay rates which yield a net profit, the government must pay rates to yield the same profit upon the capital invested in the property which it is not' entitled to use without compensation. If the rates charged the public yield no profits, the government is under no obligation to pay larger rates.
The remainder which we have reached in our computation represents earnings from rates which the claimants have the right to impose upon the defendants, viz, rates to earn all other payments on account of the service employed in transportation —whether on the trains, or in the yards, or in the stations, or at the agencies; for the cost of moving the trains; for the hire of the rolling-stock ; for taxes on the equipment, or on the capital invested in it; for telegraphs; for advertising; for loss and damage to passengers or freight; for legal expenses; for general expenses; in short, for all outlays necessary to their business as- common carriers, except the outlays for maintenance of way as above defined; and also for the payment of net profits on equipment.
The defendants should pay that proportionate part of this remainder which the sum of their transportation at ordinary rates bears to the gross transportation earnings of the road. The gross transportation earnings of the road were $2,806,946.60. and the gross amount of the défendants’ bills was $170,843.55. This proportion is, therefore, represented by the fraction
170 8 43.5 5 230094 6.60'
The findings show the cost of maintenance of way during the period to have been $381,010.41, and the net earnings to be $1,250,574.45. The capital account, as it appears by the books, shows the cost of the road and equipment' to have been $23,439,771.68, of which $22,215,611.59 represent the cost of the road, and $1,224,160.09 represent the cost of the equipment. Assuming this proportion to be correct, the result would be thus stated.
*147 Gross earnings-■.$2,806,946 60 Deduct:
Maintenance of way. $381,010 41
Proportion of profit earned by tbe road. 1,185,262 23
- 1,566,272 64
Proportionate part of earnings to which, the defendants should contribute. 1,240, 673 96
2,806,946.60 :170,843,55 :1,240,673.96 :: 75,513.06.
This computation yields the practical result of 55.8 per cent, of gross earnings as due for the use of the road, and 44.2 per cent, thereof as due claimants for .transportation.
But the claimants’ capital account in the construction of their road is swelled beyond its actual cost by reason of a discount in the sale of stock and securities, so that, it is said, the proportion of net earnings thus assigned to the road is not the true proportion. This contention is set up by the claimants. It is completely answered by saying that the claimants have not proved the amount of the discount. Their witness states, and we have found it as a fact in the exact language of the witness, that the stock and securities represented in capital account for construction were sold at a discount. There the witness stops, and there the finding stops.' It was within the power of the claimants, and it was not within the power of the defendants, to complete the proof on this point by showing what was the actual amount of the discount in the sales of those stocks and securities. In the absence of that proof we must take the capital account, as it stands on the books, at par value, as the true cost of construction. We are not required to consider, and it would be improper for us to indicate, what we might have done had the claimants completed the proof on this point.
Taking, however, theaverage relation between cost ofroad and cost of equipment deduced from the reports of the twenty-five railroads referred to in Finding XV, we have 88.9 per cent, as the cost of the road and 11.1 as the cost of equipment. Adopting this relation, we have a result of $79,986.70 as the amount of the claimants’ compensation, instead of $75,535.50, which yields 53.2 as the percentage for the use of the road, and 46.8 as the percentage due the claimants.
*148 Abandoning tbe particular operations of tbe claimants’ road, and taking tbe average operations of tbe roads referred to in Finding XY, we have, in round numbers, tbe following results:
Gross earnings... $473,517,000
Deduct:
Maintenance of way. $90,713,000
Proportion net earnings earned by road.. 152,206,000
- 242,914,000
Balance. 230, 603,000
Taking this proportion, we have a result of $83,200.88 as tbe sum to be paid to tbe claimants, or 51.3 per cent, as tbe allowance for tbe use of tbe road, and 48.7 as tbe percentage due tbe claimants.
In view of these different results, obtained from independent calculations, all approximating to an equal division of tbe gross earnings between tbe road and service, we can have no doubt that when Congress in 1879 authorized tbe payment of 50 per cent, of tbe approved bills of tbe land-grant roads, it intended to give its assent to tbe principle that 50 per cent, of tbe gross earnings is on tbe whole a just remuneration for tbe services and the profits which we have included in this computation.
Tbe exact proportion between tbe cost of a road and the cost • of its equipment varies in different roads and in tbe same road at different times. But in view of tbe obvious necessity of establishing a fixed relation to govern current payments for work as done, unless tbe practice of refusing payment and sending claimants here is to be perpetuated, and in view of tbe manifest advantage of having that rate tbe same with all tbe roads, Congress has practically agreed that, irrespective of the particular relations between tbe cost of a road and tbe cost of its equipment, 50 per cent, of its gross earnings is a fair compensation to tbe company for tbe actual cost of transportation and such part of tbe profits upon transportation as are earned by tbe company out of tbe government. We have, therefore, felt ourselves justified in finding as a fact that 50 per cent, of gross earnings is such a proper compensation.
Certain manifest advantages which accrued to tbe defendants from this arrangement, and which must have bad a pecu *149 niary value to them, but wliicli entailed no pecuniary loss upon and no damage to tbe claimants, do not form part of that compensation. If tbe claimants are entitled to have them enter into tbe computation of damages, then tbeir value, if it can be ascertained, should be added to the 50 per cent, of gross earnings which the claimants are entitled to.
The rights of the defendants are clearly marked out, and the boundaries thereof defined, by the Supreme Court:
“All that the act reserves is the free use of the railroad. Of course, this implies also the free use of all fixtures and appurtenances forming part of the road, and which are essential to its practical use. * * * The free use of the railroads does not entitle the government to have troops or property transported by the companies over their respective roads free of charge for transporting the same. * * * The objection that it would be inconvenient for government to provide locomotives and cars for the performance of its transportation cannot properly be urged. The government can do what it always has done, without experiencing any difficulty — employ the services of the railroad and transportation companies which have provided these accommodations.” (Lake Superior and Miss. R. R. Co. v. The United States, 93 U. S., 453-454.)
If the government were thus compelled to haul its own transportation over the land-grant roads, it would have to keep engines and cars, and fuel and machinery, and maintain a large staff of servants upon every such road, and would be put to great expenses, which were avoided by the arrangements actually made with the companies. Instead of requiring the •defendants to incur this expense, the claimants agreed, during the period now sued for, to do the handling and hauling for them, and to regard the statutory rights of the defendants as a proper subject for consideration in estimating the worth of such services. The advantage which the defendants gained thereby had an appreciable money value. An executive officer bargaining for future transportation might take this into consideration in making his bargain, and the company might have it in view in demanding a rate; but in a judicial proceeding to recover the reasonable worth of the transportation,-where there was no previous agreement, it is outside of the legal rule for the «computation of damages. It was not part of the cost of the service nor part of the profit resulting from doing it, and it .caused no pecuniary loss to the claimants.
In actions ex-contraotu damages are given as a compensation *150 to the plaintiff for injuries which he has received from the defendant. They must be the result of the injury — that is, they must result to the plaintiff from the injury — and they must be commensurate with the injury,sustained.
Applying these simple elementary tests to this claim, it appears that the advantage which the defendants gained form no part of the injury which the claimants received; and to pay its worth to the latter would not be giving them commensurate-compensation for an injury which resulted to them, but a gratuity commensurate with a benefit which resulted to the defendants. Even in actions ex delicto to recover damages for infringements ot patent rights, where the benefits resulting to the defendant are sometimes considered in computing damages, it is only done when it evidently forms the only measure for the plaintiff’s loss. u It is only where, from the peculiar circumstances of the case, no other rule can be found, that the defendant’s profits become the criterion of the plaintiff’s loss.” (Seymour v. McCormick, 16 How., 490.)
We exclude this element in the computation of damages. If we admitted it we should still have to ascertain the worth of the advantages gained by the claimants from the same causes. They escaped the exercise by the defendants of their statutory right to put trains on the road, and thus interfere with its ordinary traffic and derange their time-tables. But all this is outside of the subjects which we can properly consider in computing the damages in this case.
If these advantages and counter advantages were proper subjects for consideration in that connection, Ave should feel obliged to send the case back for further hearing. It is true that the long custom between the parties to pay and receive G6§ per cent, of the ordinary tariff rates as a proper compensation for transportation might afford some presumption that 16f per cent, of those rates is, on the whole, a fair adjustment of the balance of gain from the defendants’ abandonment of their right to do their own transportation. Counsel on both sides, however, argued the case on other theories, and Avithout considering this point.
The claimants’ damages on this branch of their case are therefore limited to 50 per cent, of the bills for the land-grant service audited and approved by the Quartermaster-General; that is, to 50 per cent, of $170,843.55. This amounts to $85,421.7(3,- *151 Of tbis sum, tbe claimants have already received $79,748.44, leaving due $5,673.32. Adding tbis amount to tbe $5,656.09 already found due for transportation over tbe non-land-grant branches of tbe. claimant’s road, we bave $11,329.41 as tbe amount of tbe judgment in tbe claimants’ favor.
Judgment will be entered accordingly.