**SANTA FE PAC. R. CO. v. ICKES, Secretary of the Interior, et al.**

No. 8956—7.

United States Court of Appeals
District of Columbia.

Argued Nov. 13, 1945.

Decided Feb. 4, 1946.

GRONER, C. J., dissenting.

Mr. Lawrence Cake, of Washington, D. C., for appellant.

Mr. Ernest F. Hom, Principal Attorney, Office of the Solicitor, Department of Interior, of Washington, D. C., of the Bar of the Supreme Court of California, pro hac vice, by special leave of Court, with whom Mr. Harry M. Edelstein, Assistant Solicitor, of Washington, D. C., and Mr. Sidney B. Jacoby, Senior Attorney, Department of Interior, of Chicago, Ill., were on the brief, for appellees.

Before GRONER, Chief Justice, and CLARK and PRETTYMAN, Associate Justices.

CLARK, Associate Justice.

The Santa Fe Pacific Railroad Company brought two actions in the District Court requesting relief by way of injunction and mandamus to compel the Secretary of the Interior to determine the Railroad's right to certain lands selected in accordance with Acts of 1874[1] and 1904[2], without regard to the release executed by the Santa Fe under Title III, Part II, § 321 of the Transportation Act of 1940.[3] The District Court dismissed both complaints on the merits.[4]

The Santa Fe's predecessor in interest, the Atlantic and Pacific Railroad Company, had received lands under an "aid of construction" granting act enacted in 1866.[5] Section 3 of that Act provided for the basic grants to Santa Fe's predecessor, and gave the railroad the right to select indemnity lands where lands within the primary limits of the grant "shall have been granted, sold, reserved, occupied by homestead settlers, or pre-empted, or otherwise disposed of * * *," as well as the right to select agricultural lands in substitution for reserved mineral lands within the original grants. No rights involving these "indemnity" lands are in controversy here. However, it later developed that subsequent to the time when the railroad's rights attached to particular lands under the 1866 Act some of the original grants came into the possession of settlers whose entry or filing was allowed under the preemption or homestead laws. The United States, desiring to confirm title to such lands in the homesteaders, passed Acts in 1874 and 1904 permitting the railroad, when requested to do so by the Secretary of the Interior, to reconvey to the government land, as to which title had vested in the railroad, thus making it possible for the government to perfect title in the later claimants.[6] In consideration for the reconveyances under these Acts the railroad gained the right to select "lieu" lands to replace those given up. The controversy here arose out of the reconveyances by the railroad of lands which enabled the government to perfect title in various homesteaders.

The situation thus created should be distinguished from the right to select "indemnity" lands under Section 3 of the 1866 Act where land covered by the initial grant was found to be already in the rightful possession of others, or otherwise unavailable to the railroad. The later Acts were passed to remedy a situation wherein the railroad's rights were prior in point of time, thus requiring a reconveyance to the United States by the railroad in order that the government might pass good title to subsequent settlers.

In case No. 8957 the Santa Fe in 1916, at the request of the Secretary of the Interior, reconveyed to the United States certain lands in accordance with the terms of the 1874 Act, and in 1943 sought to exercise its right of selection accruing as a result of the 1916 relinquishment.

In case No. 8956 the Santa Fe in 1911 again, upon a similar request, reconveyed lands under the provisions of the 1904 Act and in August of 1940 it applied to select lands in replacement for those given up at the government's request under that Act. While its request was pending, the railroad in December 1940 filed with the Sec-

[1] Act of June 22, 1874, c. 400, 18 Stat. 194, 43 U.S.C.A. § 888.

[2] Act of April 28, 1904, c. 1810, 33 Stat. 556.

[3] Act of September 18, 1940, c. 722, 54 Stat. 954, Section 321 (b), 49 U.S.C.A. § 65, reading in part: "If any carrier by railroad furnishing such transportation, or any predecessor in interest, shall have received a grant of lands from the United States to aid in the construction of any part of the railroad operated by it, the provisions of law with respect to compensation for such transportation shall continue to apply to such transportation as though subsection (a) of this section had not been enacted until such carrier shall file with the Secretary of the Interior, in the form and manner prescribed by him, a release of any claim it may have against the United States to lands, interests in lands, compensation, or reimbursement on account of lands or interests in lands which have been granted, claimed to have been granted. or which it is claimed should have been granted to such carrier or any such predecessor in interest under any grant to such carrier or such predecessor in interest as aforesaid. * * *"

[4] 57 F.Supp. 984. The question in the two cases is the same. In one, No. 8957, the 1874 Act is in issue and in the other the 1904 Act.

[5] Act of July 27, 1866, c. 278, 14 Stat. 292.

[6] The major difference between the two Acts is that the one passed in 1874 applied to all railroad land grants while the 1904 Act was applicable only to the Atlantic and Pacific grant in New Mexico.

retary of Interior a release under the Transportation Act of 1940 of "any and all claims of whatever description to lands, interests therein, compensation or reimbursement therefor on account of lands or interest granted, claimed to have been granted, or claimed should have been granted by any act of the Congress to Santa Fe Pacific Railroad Company or to any predecessor in interest in aid of the construction of any portion of its railroad."[7] .

The Commissioner of the General Land Office and the Secretary of the Interior thereafter rejected both of appellant's applications to select "lieu" lands on the grounds that the release under the 1940 Act covered the claims in question and that they could not be asserted after the filing and acceptance of the release.

The release was filed to enable the railroad to enjoy the full applicable commercial rates on certain types of government traffic which had previously been transported at "land grant" rates, and the Santa Fe concedes that it was effective to wipe out any claims it may have had to indemnity lands as provided for in the original granting Act of 1866, and admittedly as a result of the release the Santa Fe actually surrendered and gave up claims to hundreds of thousands of acres of land which it would otherwise have been entitled to demand be patented to it.

However, in bringing these appeals the Santa Fe seeks to establish that, contrary to the District Court holding, the 1874 and 1904 Acts are to be regarded as separate pieces of legislation, conferring on the railroad under the circumstances shown to exist here, a positive right to select lands to replace those reconveyed. Santa Fe maintains that its rights arising under the later acts are not claims for lands granted "in aid of construction" and hence not covered or contemplated by the 1940 Act and the release filed under it.

Shortly stated, the railroad's position here is that the Acts of 1874 and 1904 are not amendments of the Act of 1866, nor Acts granting land in aid of construction,

but were enacted to enable the United States to recover title to lands then the property of the railroad in consideration for which it offered a quid pro quo in the form of exchange of other lands belonging to the United States.

The lower court has held that the three enactments, i. e., the 1866, 1874 and 1904 Acts, are but parts of a single legislative scheme. Further, it concluded that the 1940 Act, in relation to the granting acts, was intended " * * * to wipe the slate clean of such claims by any railroad which enjoyed the benefits of the rate concessions made by the Transportation Act of 1940." Santa Fe Pac. R. Co. v. Ickes, D.C. 57 F.Supp. 984, 986, 987. If we were to accept the position taken by the government and sustained by the lower court to the effect that the 1874 and 1904 Acts are but amendatory of the 1866 Act we would be constrained to hold that the railroad gave up all of its claims under these acts when it filed its release under the 1940 Act. However, we have carefully examined the three "granting acts" in issue in the light of § 321 of the Transportation Act of 1940, and, for reasons which follow, cannot accept the conclusion reached by the District Court.

In interpreting the 1940 Act the Secretary of Interior, judging from the form in which the release was drawn, then considered it applicable only to claims for lands "granted in aid of construction." But the government in its brief suggests a wider significance to the quoted words than we think can be implied.[8] With this latter interpretation we do not agree. Furthermore, it is perfectly apparent from the language of the release itself that the construction of the 1940 statute now contended for by the Secretary is, as we have seen, at variance with that put upon the same statute by the selfsame Secretary of the Interior when performing his statutory duty of prescribing its terms in conformity with the statute.

▇ Though the legislative history of this particular statute is of little aid on this point, it seems hardly reasonable that

---

[7] In accordance with the terms of the statute there were excepted from the release, " * * * lands sold by the company to innocent purchasers for value prior to September 18, 1940, lands embraced in selections made by the company and approved by the Secretary of the Interior prior to September 18, 1940, or lands which have been patented or certified to the company. * * * "

[8] After quoting from the 1940 Act the government's brief, footnote 7, pg. 14, case No. 8956, sets forth: "In other words, the releases to be filed by the land grant railroads were not limited in their application to any particular grants or to any type of claims arising under the grants, but were to apply to any claim to land under any grant."

Congress should have intended to have the release required under the 1940 Act apply to any claims other than those for lands granted in aid of construction. Otherwise, it is conceivable that the railroads would be required to relinquish land claims which might in no way be related to the lands granted as construction inducements.[9]

■■■ Having thus limited the application of the release under the 1940 Act, we proceed to an appraisal of the respective positions of the parties. There is of course no question but that the 1866 Act provided for grants "in aid of the construction." Santa Fe Pac. R. Co. v. Work, 267 U.S. 511 45 S.Ct. 400, 69 L.Ed. 764. The rights accruing to the railroad under such a grant are contractual; the railroad receiving the land in return for building and operating a line. Burke v. Southern Pac. R. Co., 234 U.S. 669, 680, 34 S.Ct. 907, 58 L.Ed. 1527. Further, it will be agreed that the road's rights stemming from the later exchange acts are likewise contractual by nature. Santa Fe Pacific R. Co. v. Fall, 259 U.S. 197, 42 S.Ct. 466, 66 L.Ed. 896. It is from this foundation that the government argues that the right to make selections under the 1874 and 1904 Acts is essentially the same as the right to make selections of indemnity lands under the 1866 Act. Hence, it is urged that the release under the Act of 1940 wipes out the railroad's claims under all three pieces of legislation. The railroad counters with the proposition that these are separate statutes enacted for clearly different primary purposes and thus ought not to be read as one in relation to the 1940 Act.

■■ We perceive substantial reasons for endorsing the point of view advanced by the railroad insofar as it denies that the 1874 and 1904 Acts are to be interpreted as "grants in aid of construction." We may concede, for the purposes of this opinion, that the acts here in issue are "granting" acts, and also that they create contractual rights in many ways comparable to those arising under the original granting Act of 1866 which was in "aid of construction"; however, it does not necessarily follow, as the government contends, that the road's claims under the later acts are all properly identifiable with the 1866 Act.

In support of this view we observe that: (1) The lands released pursuant to the 1874 and 1904 Acts had for all practical purposes vested in the railroad.[10] The railroad's rights were not, therefore, at the time of release, to be classed as mere naked claims, as was the case with regard to "indemnity" rights provided for in the 1866 Act. (2) While the lands reconveyed had been acquired as grants in "aid of construction," the railroad was under no compulsion to release them, and it did so only because of a new promise by the government which guaranteed replacement lands. This transaction cannot be rightly termed ancillary to or amendatory of the original grant. It was not the receiving of a grant in "aid of construction"; the construction phase was long since passed. It was a new bargain, entered into for a new consideration and for a different purpose.[11]

Our decision rests on what we regard as the distinctly separate character of the

---

[9] For a recent Congressional expression on the matter of the Federal Government's policy regarding the recapture of lands vested in the railroads under various granting acts see: House Report No. 393, 79th Congress, 1st Session, March 26, 1945. (H. R. 694) pg. 12, " * * * It has been suggested that as a condition to the surrender by the Government of its right to these land-grant deductions the land-grant railroads should be required to reconvey to the United States any of the granted lands still held by them. Aside from the fact that, as previously stated herein, the Government has already been more than fully reimbursed for the lands granted by it, this suggestion has been shown by the testimony to be neither equitable nor practicable.

"A large portion of the remaining land-grant lands are held by roads such as the

Union Pacific and Central Pacific whose grants contained no requirement for reduced charges on Government traffic. As to the theory on which those roads should be required to give up such lands the committee has heard no suggestion. * * *

"Also among the land-grant roads themselves will be found many which have little or no granted lands remaining to them. The burden of such a condition would thus fall most unevenly even upon the land-grant lines."

[10] The fact that title had vested was not disputed by appellees either in their brief or oral argument, and we do not regard it necessary to discuss here the mechanics incident to the issuance of patents confirming title to such lands.

[11] This difference in purpose is well illustrated by the following language from

contractual obligations. Under the 1866 Act the government granted land as an incentive to build. Under the 1874 and 1904 Acts the government granted land in exchange for that which it wished others to have free from any possible claims of the railroads, which admittedly had good title. To say that because the lands relinquished were granted "in aid of construction" other land claims accepted in place and stead of the relinquished lands are to be regarded as subject to the terms of the original grant is, we think, to ignore the succeeding transactions and vitiate contractual rights arising wholly independently of the original Act. We do not believe that such was the intention of Congress.

Viewed from a slightly different perspective, it will be seen that the government could not have reached the lands relinquished under the 1874 and 1904 Acts had the railroad refused to reconvey, as it had the unquestioned right to do. This was specifically admitted by the Solicitor for appellees in the oral argument in response to a direct question from the court. Admittedly also the lands under given up by reconveyance would not have been returned to the government by the release under the 1940 Act. But the government now contends that the voluntary giving up of the once vested lands the provisions of the 1874 and 1904 Acts, throws the railroad's claims back unto the same footing as those for "indemnity" lands which had never been selected under the 1866 Act. The dignity of the railroad's rights is thus depreciated by its agreeing to do business with the government at the government's request under the later acts. We cannot agree that such result was in contemplation when the 1874 and 1904 Acts were passed.

■ In our view the rights acquired through relinquishment of vested interests stand equal in strength to the actual holding of the initial grants. In other words, the selection rights accruing from the subsequent transactions are equivalent to the rights in the lands given up and are not, and were not intended to be, effected by the 1940 Act. This, we conceive to be a much sounder approach than that urged by the government which would require us to consider all transactions as a part of one inseparable contractual arrangement whereby the strength of the railroad's claims must be judged by the terms of the 1866 Act.

■ Even regarding the Acts of 1866, 1874 and 1904 as a part of the same "legislative scheme" does not preclude the result we have reached. Unquestionably the acts are by their character related to the same general problem of adjusting railroad land claims, but this does not foreclose the possibility of separate rights being established as they were by reason of independent transactions in accordance with the respective provisions of the different statutes. The inherent relationship of the acts does not require that we regard them all as "grants in aid of construction," or a reading forward or backward into the others, the terms of any one of them. Further, we do not find this to be a case where the court is bound on any theory to accept the latest statutory interpretation applied by the administrative officer.[12]

In reaching the decision that the Railroad is entitled to have its selections under the 1874 and 1904 Acts reviewed without reference to the 1940 Act release, we have been most mindful of the policy considerations behind the respective pieces of legislation. We believe that neither policy nor precedent is offended by the decision we have reached but rather, that the result will more clearly define and establish the respective interests involved in accordance with the intent of the Congress.

Reversed.

Judge GRONER is of opinion that the applicable section of the Transportation Act of 1940 is broad enough to cover the lands in dispute, and accordingly is for affirming the judgments of the District Court.

---

Santa Fe Pac. R. Co. v. Work, 267 U.S. 511, 516, 45 S.Ct. 400, 401, 69 L.Ed. 764: "The Act of 1874 was passed to help homestead and other settlers who were in hard case because they had established their settlement after the grant to the railroad company was held to have attached. The question when it did attach was for a long time doubtful and the subject of litigation. This act of 1874 was intended to induce the railroad companies to relinquish such lands thus illegally occupied as against them by promising in lieu thereof other lands of equal area in both odd and even sections within the prescribed limits."

[12] Cf.: Ickes v. Underwood, 78. U.S. App.D.C. 396, 141 F.2d 546; and United States ex rel. Jordan v. Ickes, 79 U.S.App.D.C. 114, 143 F.2d 152; cited in the government's brief.