# UNITED STATES *v.* UNION PACIFIC RAILROAD COMPANY.

## APPEAL FROM THE COURT OF CLAIMS.

No. 199.   Argued January 30, 1919.—Decided March 31, 1919.

The term "troops of the United States," as used in land grant acts, and in the agreement of the Union Pacific Company, in relation to transportation for the Government, *held* not to embrace any of the following classes of persons, when traveling separately and not as part of a moving body or detachment of soldiers, *viz:* Discharged soldiers, discharged military prisoners, and rejected applicants for enlistment; applicants for enlistment, provisionally accepted, but subject to final examination and not sworn in; retired enlisted men; and furloughed soldiers *en route* back to their stations.

52 Ct. Clms. 226, affirmed.

THE case is stated in the opinion.

*Mr. Assistant Attorney General Brown,* with whom *Mr. Charles H. Weston* was on the brief, for the United States.

*Mr. William R. Harr,* with whom *Mr. Charles H. Bates* was on the brief, for appellee.

MR. JUSTICE BRANDEIS delivered the opinion of the court.

Most of the acts of Congress which granted lands in aid of railroads provide that they shall be "free from toll or other charge upon the transportation of any property or troops of the United States." [1]   This clause was

---

[1] Circular No. 16, Qua 'ermaster General's Office, 1912, entitled "Schedule of Land-Grant and Bond-Aided Railroads of the United States," p. 28, *et seq.*   Act of September 20, 1850, c. 61, § 4, 9 Stat. 466

construed in *Lake Superior & Mississippi R. R. Co.* v. *United States*, 93 U. S. 442, as conferring only the free use of the roadbed as a highway. Since then, under appropriate legislation, payment has come to be made by the Government for the transportation of property and troops at rates equal to fifty per cent. of those charged private parties. The Union Pacific, having entered into an agreement to that effect, claimed payment at the full rate for certain persons carried as passengers upon the request of the Government. The Auditor of the War Department refused to allow payment for these passengers at more than half-fares, on the ground that they were within the provision, for transporting "troops of the United States"; and his ruling was sustained by the Comptroller of the Treasury. (21 Decisions of the Comptroller, 651.) Thereupon this suit was brought in the Court of Claims for the amount disallowed; and judgment was rendered for the railroad. 52 Ct. Clms. 226. The case is here on appeal. The questions presented are

---

467. A few of the acts granting lands in aid of railroads provided that the grant is "subject to such regulations as Congress may impose restricting the charges for . . . government transportation." Act of July 27, 1866, c. 278, § 11, 14 Stat. 292, 297. The Army Appropriation Acts make provision for payment under both classes of statutes, payment in neither case to exceed fifty per cent. of the rates charged private parties. See Act of July 16, 1892, c. 195, 27 Stat. 174, 180; Act of March 2, 1913, c. 93, 37 Stat. 704, 715. Fifty per cent. has been adopted by the War Department as the standard rate of payment. The Union Pacific on May 15, and June 3, 1911, became a party to the so-called "Land-Grant Equalization Agreements" entered into by the Quartermaster General of the United States with most of the important roads of the United States in other than New England or Trunk Line territories. By these agreements, the several roads consented (with certain exceptions) to accept the same net rate on both passenger and freight traffic via their respective lines as are effective via land-grant lines. "Freight and Passenger Land-Grant Equalization Agreements and List of Carriers Participating," Circular No. 6, Office of Chief Quartermaster Corps, 1913.

whether any of the following classes of persons are to be deemed "troops of the United States" within the provision of the land-grant acts:

1. Discharged soldiers; that is, former enlisted men of the Army en route to their homes after discharge.

2. Discharged military prisoners; that is, discharged enlisted men en route to their homes or elsewhere after serving sentence as military prisoners.

3. Rejected applicants for enlistment in the Army; that is, men who having passed the required tests at the recruiting stations and having been forwarded to the recruiting depots for final examination and enlistment, were there rejected and were being returned to the recruiting stations from which they came.

4. Accepted applicants for enlistment in the Army; that is, applicants examined at general recruiting stations, found mentally, morally, and physically fit for service, and being forwarded to recruiting depots for final examination and enlistment.

5. Retired soldiers; that is, enlisted men of the Army en route to their homes after retirement.

6. Furloughed soldiers; that is, enlisted men of the Army on furlough en route back to their proper stations.

None of these persons travelled as part of a moving army, troop, or body of soldiers. That is, they travelled separately as individuals, and (with few exceptions) each on a different day and to widely scattered destinations. Under recent acts of Congress and Army Regulations,[1] the transportation of persons of some of these classes is paid for by the Government.

In defining the transportation rights secured to the United States, these land-grant acts draw a broad distinction between freight and passengers. All "property"

[1] See acts cited in note 1, p. 358, *infra.* Army Regulations, 1913, §§ 145, 1235, 1379, 1115. Army Regulations, 1913, wherever cited herein, refers to the edition corrected to April 15, 1917.

of the Government, whatever its character and intended use, is to be carried "free of toll or other charge;" but of the many persons in its service, only "troops." The history of the legislation shows that both the broad term, "any property," and the narrower one, "troops," was adopted deliberately. The earliest land-grant act in which the provision appears is that of September 20, 1850, c. 61, § 4, 9 Stat. 466, 467, under which the Illinois Central was constructed. The bill as introduced [1] provided for the free transportation of "troops and munitions of war." It was amended so as to read "any property or troops." There had been an earlier act granting land to the State of Illinois for the construction of a canal (Act of March 30, 1822, c. 14, 3 Stat. 659) which was amended (Act of March 2, 1833, c. 87, 4 Stat. 662) so as to permit, on the same terms, the use and disposition of the land for railroads. That act provided for the free transportation of "any property of the United States, or persons in their service."

In 1850 the word "troops" had (and it has ever since had) an established meaning:—namely, "soldiers collectively,—a body of soldiers." Thus the Army Appropriation Act of that year (Act of September 28, 1850, c. 78, § 1, 9 Stat. 504, 506) provides for the "transportation of the army, including the baggage of the troops when moving either by land or water" and for "mileage, or the allowance made to officers for the transportation of themselves and baggage when travelling on duty without troops." The contemporary legislation draws a clear distinction also between troops, that is, those then having the status of soldiers, and those who once had been in, or were seeking to enter, the military service. Thus the Army Appropriation Act of March 2, 1847, c. 35, 9 Stat. 149, 151 (which provides in substantially the

---

[1] Cong. Globe, 1850, 31st Cong., 1st sess., vol. 19, pt. 1, p. 844.

same terms as that of 1850 for the transportation of
troops) makes specific provision for "forwarding destitute
soldiers to their homes," for the "comfort of discharged
soldiers," and for "expenses of recruiting," which in-
clude the cost of transportation. See Army Regulations,
1857, § 1321. And the Resolution of March 3, 1847,
[No. 7], 9 Stat. 206, authorizes the refund of moneys
expended by the States and individuals "in organizing,
subsisting, and transporting volunteers previous to their
being mustered and received into the service of the United
States for the present war, and for subsisting troops in
the service of the United States." In view of the estab-
lished meaning of the term "troops" as used by Congress
the duty of the court is merely to apply the provisions
of the act to the several classes of persons described
above.

*First.* The first three classes, namely, discharged
military prisoners, discharged enlisted men, and rejected
applicants for enlistment, are clearly not "troops of the
United States." Their status is that of the civilian. They
form no part of the military establishment. They may
go where they please and do what they please, subject
to no more interference by the military authorities of the
Government, than if they had never been, or had never
sought to be, connected with the Army. They were
travelling for their own personal ends. Congress recog-
nizes the distinction between those forming part of the
Army and those who do not, because they are recruits or
have been discharged; and it makes special provision
for their transportation.[1] Such had formerly been also
the opinion of the Comptroller of the Treasury. Com-
pare Digest, Second Comptroller's Decisions, vol. 4,
§§ 354 and 355.

[1] E. g., Act of March 2, 1913, c. 93, 37 Stat. 704, 715; Act of April 27,
1914, c. 72, 38 Stat. 351, 364; Act of March 4, 1915, c. 143, 38 Stat.
1062, 1076.

*Second.* Applicants for enlistment who have been accepted provisionally, but have yet to be subjected to the final examination at the recruiting depots and to take the oath before they become a part of the soldiery of the Nation, are not "troops of the United States." It is the actual enlistment, the oath of allegiance, that changes the status from a civilian to soldier. Compare *In re Grimley,* 137 U. S. 147, 156–157; *Tyler* v. *Pomeroy,* 8 Allen, 480; 19 Decisions of the Comptroller, 367; Army Regulations, 1913, § 847. The officers at the recruiting stations are expressly forbidden to administer this oath. Army Regulations, 1913, § 841. Such applicant is then not even a potential soldier; for he may be rejected on final examination.[1] And it is the actual and not the potential status that must govern. Compare *Alabama Great Southern R. R. Co.* v. *United States,* 49 Ct. Clms. 522, 537. The fact that under the Army Regulations he receives the same rations as an enlisted man, and that he is subject to the same medical attention,[2] does not effect a change of status. And the fact that the transportation is for the purposes of the Government in connection with its military establishment is immaterial. Workmen in armor plants and civilian clerks in the War Department at Washington travel for purposes of the Government, but are obviously not "troops of the United States" within the meaning of the land-grant legislation. The Army Appropriation Acts make specific provision for the transportation of "troops" and of "recruits."[3]

---

[1] Of the 45,111 applicants in the several recruiting districts of the United States provisionally accepted in the year ending June 30, 1915, 5,866 were finally rejected at the recruiting depots; 3,993 provisionally accepted applicants are recorded as having "declined to enlist at depots or eloped en route." Report of the Adjutant General, War Department, Annual Reports, 1915, vol. 1, pp. 202, 203.

[2] Army Regulations, 1913, §§ 1224, 1225, 1232, 1473, 1476.

[3] See, for example, acts cited in note 1, p. 358, *ante.*

*Third.* Retired enlisted men en route to their homes after retirement are also not "troops of the United States." They travel for their own purposes. Congress has declared that such retired men shall for certain purposes be deemed a part of the Army (Act of February 2, 1901, c. 192, § 1, 31 Stat. 748); but they may be employed only after Congress has authorized the raising of volunteer forces; and not even then for field duty. Act of April 25, 1914, c. 71, § 11, 38 Stat. 347, 350. The Army Regulations for 1913 make no provision requiring any service from retired enlisted men. Practically they have retired *from*, and not simply into a different branch of the Army. Compare *Murphy* v. *United States*, 38 Ct. Clms. 511, 522; Army Regulations, 1913, Article XX. See also *United States* v. *Tyler*, 105 U. S. 244. The fact that they may thereafter be called into the Army does not make them "troops of the United States." Any male citizen may at some time be called into the service. Compare *Alabama Great Southern R. R. Co.* v. *United States, supra.*

*Fourth.* The furloughed soldier is, of course, a part of the Army or troops of the United States; but his transportation back to the proper station, is not "transportation of troops" within the meaning of the land-grant acts. The furloughed soldier travels for his own purposes. The Government merely advances to him the cost of transportation and subsistence while on furlough; and does this, only if the soldier lacks funds to bear the expense himself. The advance must be repaid. Army Regulations, 1913, § 110.

We have no occasion to consider whether persons not enlisted as soldiers, but forming a part of a moving army or detachment are to be deemed "troops of the United States" within the provision of the land-grant acts; nor whether a soldier travelling for the purposes of the Government, but not for any purpose connected with war

or the preparation for war, falls within the provisions, 19 Op. Atty. Gen. 572.

The judgment of the Court of Claims granting full compensation for carriage of persons within the six classes considered is

*Affirmed.*