## SOUTHERN RAILWAY CO. *v.* UNITED STATES.

No. 578.  Argued March 28, 29, 1944.—Decided April 24, 1944.

*Mr. Sidney S. Alderman,* with whom *Messrs. Seddon G. Boxley* and *S. R. Prince* were on the brief, for petitioner.

*Assistant Attorney General Shea,* with whom *Solicitor General Fahy* was on the brief, for the United States.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

In 1933 petitioner, a common carrier, entered into a "Freight-Land-Grant Equalization Agreement" with the Quartermaster General, acting for the United States. This agreement was made under the authority of § 22 of the Interstate Commerce Act.  24 Stat. 387, 49 U. S. C. § 22.  So far as material here, petitioner agreed "to accept for the transportation of property shipped for account of the Government of the United States and for which the Government of the United States is lawfully entitled to reduced rates over land-grant roads, *the lowest net rates lawfully available,* as derived through deductions account of land-grant distance from the lawful

rates filed with the Interstate Commerce Commission applying from point of origin to destination at time of movement." (Italics added.)

From the point of view of the carrier the purpose of the agreement was to give it a portion of government business which might have been routed over land-grant routes.[1] Land-grant roads were under an obligation to furnish transportation to the government free of charge or at reduced rates. See Public Aids to Transportation, Federal Coordinator of Transportation (1938), Vol. II, pp. 3–42 for a review of the various Acts of Congress. At the time when this agreement was made land-grant roads were required to allow the United States 50% deductions from the commercial rate for the transportation of property or troops of the United States.[2] 43 Stat. 477, 486, 10 U. S. C. § 1375. "Railroads which compete with the reduced-rate lines found themselves unable to participate, not only in the local transportation of federal troops and property between the termini of the reduced-rate lines, but also in through movements from and to points beyond such termini." Public Aids to Transportation, *supra,* p. 42. Accordingly most of those roads entered into land-

---

[1] The Court of Claims made the following finding in this case: "The purpose and effect of the freight equalization agreements of the defendant with plaintiff and with other common carriers was to equalize rates on Government property over various routes serving the same point of origin and destination, where one or more of those routes had been aided in whole or in part by grant of public lands, rates over all routes from point of origin to destination being brought down to the level of that over the route producing the lowest net rate on account of land-grant deduction. This arrangement was designed to give the equalizing carrier a portion of the Government business that was possible of routing over the governing land-grant route, and to give the Government a greater range in choice of routes where considerations of economy entered into the selection."

[2] But see § 321 of the Transportation Act of 1940, 54 Stat. 898, 954.

grant equalization agreements with the United States in order to get as large a share of the business as possible.[3] See *Southern Pacific Co.* v. *United States,* 307 U. S. 393, 394. The one involved in the present case is an example.

This suit involves 374 shipments of government property over petitioner's lines and its connections made between 1934 and 1938 while this agreement was in force.[4] There were available in case of each shipment several routes between the point of origin and the point of destination. Petitioner's route was in general the shortest. But there were other routes containing land grants of varying percentages which it was possible to use for these shipments. And the rates shown by tariffs on file with the Interstate Commerce Commission for freight shipments between the points in question were the same (with exceptions not important here) for each of the alternative routes regardless of the mileage. Petitioner computed its charges so as to allow the rate reductions to which the United States would have been entitled had it actually made the shipments by one of the available, alternative land-grant routes. The United States, however, claimed greater deductions. It showed a longer and more circuitous route which could have been used[5] and which contained more land-grant mileage than the alternative route chosen by

---

[3] Petitioner's road includes 145 miles of land-grants. But as pointed out in Public Aids to Transportation, *supra,* p. 42, "The land-grant railroads are parties to these agreements for the reason that, in many instances, a non-aided portion of a land-grant railroad competes with a reduced-rate portion of another land-grant railroad."

[4] These consisted of 147 shipments of livestock by the Federal Surplus Relief Corporation from midwestern points to southeastern points; and 227 shipments of property by the Tennessee Valley Authority.

[5] Thus in case of the shipments of livestock the routes on which the United States made its computation of rates were from 137 to almost 700 miles longer than the ones actually used.

petitioner. Since the tariff rates over either alternative route were the same, the greater land grants included in the route selected by the United States resulted in lower rates than those which were computed on the basis of the land-grant route selected by petitioner. The United States paid the lower rates. Petitioner brought suit in the Court of Claims for the difference between the amount paid and the rates computed on the basis of the tariffs for the route which it had selected. The Court of Claims denied recovery. 100 Ct. Cls. 175. The case is here on a petition for a writ of certiorari which we granted because of the public importance of the problem.

The Court of Claims found that the circuitous routes on which the United States based its computations could have been used for the shipments in question. But petitioner contends that such an interpretation of the word "available" is unreasonable in the present context and that it should be construed to mean "capable of being employed or made use of with advantage." In that connection, petitioner argues that it would have been improvident and uneconomical to ship livestock on such circuitous routes and that those routes would never in fact have been used by the United States. It is argued, moreover, that the equalization agreement properly construed requires petitioner to equalize rates computed by land-grant routes which are competitive for government traffic. Its purpose, according to that contention, was to secure for petitioner traffic which in its absence would be likely to move over competing land-grant routes, as distinguished from traffic which was possible of routing over the cheapest land-grant route.

We agree, however, with the Court of Claims. In this context the "lowest net rates lawfully available" mean to us the lowest net rates which could have been obtained on the basis of tariffs on file with the Interstate Commerce

Commission. Whether such circuitous routes as were employed in the present computation would have been actually used for these shipments in absence of the equalization agreement is of course unknown. But circuitous routing by the United States in order to obtain the benefits of its earlier land-grants to railroads was apparently a common practice. See Public Aids to Transportation, *supra,* p. 42. The records show that the privilege of obtaining the benefit of rates on land-grant routes is a valuable privilege indeed.[6] We cannot assume that the United States intended to surrender any of those benefits by granting the equalizing carriers more favorable rates than those to which it was lawfully entitled on the land-grant routes, unless the purpose to do so was plainly expressed. It must be remembered that the equalization agreement was a rate-making agreement. Its object was to divert shipments to the non-land-grant route. The land-grant route was chosen merely for the purpose of computing the rate. The fact that in a given case the shipment probably would not have moved over the land-grant route is immaterial. The United States was bargaining for low rates for the shipment of its property. It did not differentiate between the types of property shipped. It did not in terms state that land-grant routes, though actually available, would not be used in computing the rate unless they would in fact have been convenient or practicable to use for the particular shipment. The standard it prescribes is "the lowest net rates lawfully available." We may not resolve any ambiguities which may linger in that phrase against the United States. Cf. *Southern Pacific Co.* v. *United States, supra,* p. 401. We are not warranted in assuming that the United States was more generous to this carrier than the

---

[6] See Public Aids to Transportation, *supra,* pp. 43–45; Kenny, Land-Grant Railroads and the Government (1933), 9 Journal of Land & Public Utility Economics 368.

language of the contract requires. We must assume that the contracting officers for the United States drove as provident a bargain as a reading of the agreement fairly permits.

At times the United States has made equalization agreements which were more favorable to the equalizing carriers than the instant one appears to be. Thus in 1917 a passenger land-grant equalization agreement was made with petitioner and other carriers [7] whereby they agreed to accept the lowest net fare "lawfully available, as derived, through deductions account land-grant distance *via a usually traveled route for military traffic,* from a lawful fare filed with the Interstate Commerce Commission as applying from point of origin to destination via such route at time of movement." (Italics added.) That agreement suggests that when the United States desired to give equalizing carriers more favorable rates than the lowest rates to which it was lawfully entitled on land-grant routes, it chose apt words to express its purpose. It also gives added significance to the omission of any such qualification in the present agreement. It suggests that if we read into the agreement the qualification which the petitioner desires, we would remake the contract.

Much material bearing on administrative construction of various types of equalization agreements has been pressed upon us. But we have not relied on it as we found it inconclusive.

*Affirmed.*

---

[7] See Manual for the Quartermaster Corps, 1916 (1917), vol. 2, pp. 223, 230.