KRUG, SECRETARY OF THE INTERIOR, ET AL. *v.*
SANTA FE PACIFIC RAILROAD CO.

Nos. 97 and 98.   Argued January 6, 7, 1947.—Decided February 3, 1947.

*Frederick Bernays Wiener* argued the cause for petitioners.   With him on the brief were *Solicitor General McGrath, Assistant Attorney General Bazelon, Roger P. Marquis, Dwight D. Doty, Alvin O. West, Harry M. Edelstein* and *Sidney B. Jacoby.*

*Lawrence H. Cake* argued the cause and filed a brief for respondent.

MR. JUSTICE BLACK delivered the opinion of the Court.

In the first half of the Nineteenth Century the United States acquired a vast new area of sparsely populated lands in the South and West. Settlement and absorption of this territory into the older part of the country became a national problem which demanded for its solution a more rapid and extensive means of transportation of goods and people than was provided by wagons, stagecoaches, and waterways. The building of railroads largely provided the answer. They made it possible for the frontier homesteads and communities to be established on the lands of the new territory and yet maintain live contact with the national economy and culture. To encourage a rapid railroad building program, Congress chose to make public grants of a large proportion of the new lands to underwrite and subsidize the participation of private individuals and privately owned companies in the program.[1] In this congressional program of land grants "in aid of construction" were sown the seeds of the present lawsuit.

Enormous areas of public lands were granted railroads, almost equal to the acreage of the New England States, New York and Pennsylvania combined.[2] Execution of the land-grant program was marked by innumerable complex and unforeseen difficulties; its course has been beset by claims and counterclaims asserted by and between

[1] For an account see *Public Aids to Transportation,* Section of Research, Federal Coordinator of Transportation (1940) I, 45–46; Hibbard, *Land Grants,* Encyc. Soc. Sciences (1935) IX, 32–35.

[2] Hibbard, *Land Grants, supra,* 35. Other sources put the figure of federal grants-in-aid at 134,303,668 acres, equivalent to 209,849 square miles or 6.93 per cent of the area of the continental United States. Seventy railroads received these grants. *Public Aids to Transportation, op. cit. supra,* n. 1, 12, 13. See also *Great Northern Ry. Co.* v. *United States,* 315 U. S. 262, 273.

settlers, railroads, and Government.[3]    Congress, the executive agencies, and the courts have been repeatedly called upon to help resolve these conflicting claims.    The lapse of nearly a century since the program was instituted has not resolved all of them.    This lawsuit requires consideration of old and recent congressional efforts to settle these persistently recurring controversies.

One substantial field of railroad-government controversy has been the terms of the original land-grant acts which required the railroads to carry government goods and personnel free of tolls.    By reason of judicial interpretation of these terms, as supplemented by periodic legislation,[4] land-grant railroads for more than half a century immediately prior to 1940 transported for the Government at one-half of the standard commercial rates.    During the depression years beginning in the late 1920's and immediately following, railroad earnings declined considerably, and a movement began to relieve the roads of their land-grant rate obligations.    Studies by some government-selected agencies recommended legislation for outright repeal of the provisions for rate concessions to the Government.[5]    Bills to accomplish this in the 75th and 76th Congresses failed to pass.[6]    But § 321 of the Transpor-

---

[3] See *Public Aids to Transportation, op. cit. supra,* n. 1, II, 5–56, Gates, *Land Grants to Railways,* Dictionary of Amer. Hist. (1940) III, 237.   See also cases collected 43 U. S. C. A. §§ 888, 890, 893, 894, 900, 904; 43 F. C. A. §§ 888, 890, 893, 894, 900, 904.

[4] See *Lake Superior & M. R. R.* v. *United States,* 93 U. S. 442; *Atchison, T. & S. F. R. Co.* v. *United States,* 15 Ct. Cl. 126, 148.   *Cf.* 18 Stat. 72, 74; 18 Stat. 452, 453–454; 20 Stat. 377, 390; 27 Stat. 174, 180.

[5] See Committee of Three: Report of March 24, 1938, H. Doc. No. 583, 75th Cong., 3d Sess., 32; Committee of Six: Report of December 23, 1938, in Hearings, House Committee on Interstate and Foreign Commerce on H. R. 2531, 76th Cong., 1st Sess., II, 260.

[6] H. R. 10620, 75th Cong., 3d Sess.; S. 3876, 75th Cong., 3d Sess.; S. 1915 and S. 1990, 76th Cong., 1st Sess.

tation Act of 1940 [7] provided that land-grant roads could, by compliance with specified conditions,[8] collect from the Government full commercial rates, except for the transportation of military and naval freight and personnel. In brief, it required that a railroad, to qualify for full rates, must execute, within a year after passage of the Act, a release of any claim it might have "against the United States to lands, interests in lands, compensation, or reimbursement on account of lands or interests in lands which have been granted, claimed to have been granted, or which it is claimed should have been granted to such carrier or any . . . predecessor in interest *under any grant* to such

---

[7] 54 Stat. 954, 49 U. S. C. § 65.

[8] Section 321 (b) provides that

"If any carrier by railroad . . . or any predecessor in interest, shall have received a grant of lands from the United States to aid in the construction of any part of the railroad operated by it, the provisions of law with respect to [reduced rate] compensation for such a transportation shall continue to apply to such transportation as though subsection (a) of this section had not been enacted until such carrier shall file with the Secretary of the Interior, in the form and manner prescribed by him, a release of any claim it may have against the United States to lands, interests in lands, compensation, or reimbursement on account of lands or interests in lands which have been granted, claimed to have been granted, or which it is claimed should have been granted to such carrier or any such predecessor in interest under any grant to such carrier or such predecessor in interest as aforesaid. Such release must be filed within one year from the date of the enactment of this Act. Nothing in this section shall be construed as requiring any such carrier to reconvey to the United States lands which have been heretofore patented or certified to it, or to prevent the issuance of patents confirming the title to such lands as the Secretary of the Interior shall find have been heretofore sold by any such carrier to an innocent purchaser for value or as preventing the issuance of patents to lands listed or selected by such carrier, which listing or selection has heretofore been fully and finally approved by the Secretary of the Interior to the extent that the issuance of such patents may be authorized by law."

carrier or such predecessor in interest as aforesaid."
(Italics supplied.)

Shortly after passage of this Act respondent took advantage of it, and gave the Government a release framed substantially in the words of the statute.[9] Its predecessor in interest had obtained a grant of lands in Arizona and New Mexico, under an Act of 1866 containing the usual governmental rate-concession terms. 14 Stat. 292, 297.[10] The 1866 Act had specifically recited that if the Government, because of prior settlement of part of the granted lands by homesteaders, could not give possession to some of the lands granted to the railroad, it could select, under the direction of the Secretary of the Interior, other public lands in lieu of them as an indemnity. Respondent had large outstanding claims against the Government for these "indemnity" lands when it signed the release and concedes that the release extinguishes these claims.

---

[9] "Santa Fe Pacific Railroad Company, a corporation organized and existing by virtue of an Act of Congress approved March 3, 1897 (29 Stat. 622), with office and principal place of business at New York, in the State of New York, hereby, in accordance with section 321 of Part II of Title III of the Transportation Act of 1940, and the rules and regulations issued thereunder by the Secretary of the Interior, relinquishes, remises and quitclaims to the United States of America any and all claims of whatever description to lands, interests therein, compensation or reimbursement therefor on account of lands or interests granted, claimed to have been granted, or claimed should have been granted by any act of the Congress to Santa Fe Pacific Railroad Company or to any predecessor in interest in aid of the construction of any portion of its railroad.

"This release does not embrace the rights of way or station grounds of this company, lands sold by the company to innocent purchasers for value prior to September 18, 1940, lands embraced in selections made by the company and approved by the Secretary of the Interior prior to September 18, 1940, or lands which have been patented or certified to the company or any predecessor in interest in aid of the construction of its railroad."

[10] *Cf.* note 4, *supra.*

But it had other so-called lieu land claims against the Government which it asserts were not extinguished. The railroad urges that these claims are not covered by the Act or by the release. They, allegedly, are not claims "on account of" or "under any grant" of lands, but rest on contractual exchanges of lands made under the Acts of 1874 and 1904. 18 Stat. 194; 33 Stat. 556. These Acts largely represented a congressional effort to settle conflicts among railroads, Government, and settlers, which arose by reason of settlement by homesteaders on railroad-granted lands after the grants had been made. Both Acts provided that where settlers had so occupied railroad-granted lands, the railroad could, upon relinquishment of its title to them, select other lands in lieu of them. The procedure for selecting the lieu lands under the 1874 and 1904 Acts was substantially identical to the original procedure provided by the Acts for selection of indemnity lands. Before the 1940 Act respondent had, under the 1874 and 1904 Acts, relinquished title to the Government to certain lands previously granted. In August 1940, and subsequently in March 1943, respondent filed applications with the Secretary of the Interior to select its lieu lands. After the respondent signed the release, and because of it, the Secretary rejected the applications. The railroad then filed this suit in a Federal District Court for relief by injunction or by way of mandamus to require the Secretary and other Interior Department officials to pass on its applications without regard to the release. The District Court dismissed the bill on the merits, holding that the statute and release barred the claims. It read the 1940 Act as defining a congressional purpose "to wipe the slate clean of such claims by any railroad which enjoyed the benefits of the rate concessions made by the Transportation Act . . ." 57 F. Supp. 984, 987. The United States Court of Appeals for the District of Columbia reversed, holding, as respond-

ent urges in this Court, that the 1940 Act did not apply to the type of claims involved here. 80 U. S. App. D. C. 360, 153 F. 2d 305. Importance of the question decided caused us to grant certiorari.

We agree with the District Court. We think, as it held, that the Secretary of the Interior's construction of the 1940 Act was clearly right. Therefore, we do not discuss the Government's contention that, since the Secretary's construction was a reasonable one, it was an allowable exercise of his discretion which should not be set aside by injunction or relief in the nature of mandamus. See *Santa Fe P. R. R.* v. *Work,* 267 U. S. 511, 517; *cf. Santa Fe P. R. R.* v. *Lane,* 244 U. S. 492.

The respondent argues the case here as though the 1940 Act applied only to claims for "lands under any grant." The language is not so narrow. It also required railroads to surrender claims for *"compensation, or reimbursement on account of lands or interests in lands which have been granted, claimed to have been granted, or which it is claimed should have been granted . . . under any grant."* (Italics supplied.) This language in itself indicates a purpose of its draftsmen to utilize every term which could possibly be conceived to give the required release a scope so broad that it would put an end to future controversies, administrative difficulties, and claims growing out of land grants. Beyond a doubt, the words "compensation" and "reimbursement" as ordinarily understood would describe a payment to railroads in money or in kind for the surrender of lands previously acquired by them "under a grant." [11] If they do not have this meaning, their use in the Act would have been hardly more than surplusage. And when viewed in the context of the historical controversies and claims under the land grants, the conclusion

---

[11] See *United States* v. *Northern P. Ry.,* 311 U. S. 317, 332, 335, 353, 354.

that the 1940 Act covers claims such as respondent's seems inescapable.

The legislative history of the Act shows that Congress was familiar with these controversies. In 1929 it passed an Act intended to authorize and require judicial determination of land-grant claims of the Northern Pacific Railroad in order finally and completely to set them at rest. 46 Stat. 41. The suit authorized by that Act was tried in a Federal District Court and was pending in this Court when the 1940 Act was passed. *United States* v. *Northern Pac. Ry.,* 311 U. S. 317. Our decision in it shows the complexity and ramifications of the numerous questions involved in land-grant controversies. Reference to this case was made by Government officials in urging Congress to include in the predecessors of the 1940 Act a requirement that the railroad surrender all claims arising out of land grants as a prerequisite to any Government rate concessions.[12] Here, as in the 1929 Act, which applied to the claims of only one railroad, we think Congress intended to bar any future claims by all accepting railroads which arose out of any or all of the land-grant acts, insofar as those claims arose from originally granted, indemnity or lieu lands. All the Acts here involved, the Acts of 1866, 1874, 1904 and 1940, relate to a continuous stream of interrelated transactions and controversies, all basically stemming from one thing—the land grants. We think Congress wrote finis to all these claims for all railroads which accepted the Act by executing releases.

*Reversed.*

---

[12] See Hearings, Subcommittee of the Senate Committee on Interstate Commerce, S. 1915, 1990 and 2294, 76th Cong., 1st Sess., 65, 66; see also *ibid.,* 59, 164.