UNITED STATES *v.* POWELL ET AL., RECEIVERS.

Argued January 13, 1947.—Decided March 3, 1947.

*Robert L. Werner* argued the cause for the United States. With him on the brief were *Acting Solicitor General Washington, Assistant Attorney General Sonnett, Philip Elman, Paul A. Sweeney, Oscar H. Davis* and *Hubert H. Margolies.*

*Thomas L. Preston* argued the cause for respondents in No. 56. With him on the brief was *W. R. C. Cocke.*

*Thomas W. Davis* argued the cause for respondent in No. 57. With him on the brief was *J. M. Townsend.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

These cases involve controversies between the United States and respondent carriers over the transportation charges for shipments of government property in 1941. In one case phosphate rock and superphosphate are involved; in the other, phosphate rock. In both the commodities were purchased by the United States, shipped on government bills of lading over the lines of respondents, and consigned to the British Ministry of War Transport. They were exported to Great Britain under the Lend-Lease Act of March 11, 1941, 55 Stat. 31, 22 U. S. C. Supp. I, § 411 *et seq.,* for use as farm fertilizer under Britain's wartime program for intensified production of food. It is agreed that these shipments were "defense articles" as defined in § 2 of that Act.[1]

---

[1] The term includes "Any agricultural, industrial or other commodity or article for defense."

Respondents billed the United States for transportation charges on these shipments at the commercial rate and were paid at that rate. The Seaboard is a land-grant railroad. The Atlantic Coast Line is not; but it entered into an equalization agreement with the United States in 1938 under which it agreed to accept land-grant rates for shipments which the United States could alternatively move over a land-grant road.[2] The General Accounting Office excepted to these payments on the ground that land-grant rates were applicable. The amounts of the alleged overpayments were deducted from subsequent bills concededly due by the United States. Respondents thereupon instituted suits under the Tucker Act, 36 Stat. 1091, 1093, as amended, 28 U. S. C. § 41 (20), to recover the amounts withheld. The United States counterclaimed for the difference between the amounts due under the commercial rate and those due under the land-grant rate and asked that the difference be set off against the claims of respondents and that the complaints be dismissed. The District Courts gave judgment for respondents. The Circuit Court of Appeals affirmed. 152 F. 2d 228, 230. The cases are here on petitions for writs of certiorari which we granted because of the importance of determining the controlling principle for settlement of the many claims of this character against the Government.

For years the land-grant rate was fifty per cent of the commercial rate and was applicable to the transportation

---

[2] The points from which the phosphate was moved by the Atlantic Coast Line are also stations on the Seaboard Line. Hence the United States is entitled to secure land-grant deductions from the Atlantic Coast Line if the Seaboard would have been subject to land-grant rates on those articles.

Since the land-grant rates were substantially lower than the commercial rates, roads which competed with the land-grant lines were unable to get the government business. For that reason they entered into equalization agreements. See Southern Ry. Co. v. United States, 322 U. S. 72, 73–74.

of property or troops of the United States.   43 Stat. 477, 486, 10 U. S. C. § 1375; *United States* v. *Union Pacific R. Co.,* 249 U. S. 354, 355; *Southern Ry. Co.* v. *United States,* 322 U. S. 72, 73.   A change was effected by the Transportation Act of September 18, 1940, 54 Stat. 898, 954, 49 U. S. C. § 65.   See *Krug* v. *Santa Fe Pac. R. Co.,* 329 U. S. 591. All carriers by railroad which released their land-grant claims against the United States [3] were by that Act entitled to the full commercial rates for all shipments, except that those rates were inapplicable to the transportation of "military or naval property of the United States moving for military or naval and not for civil use or to the transportation of members of the military or naval forces of the United States (or of property of such members) when such members are traveling on official duty . . . ."   § 321 (a).[4]   The Seaboard filed such a re-

[3] Section 321 (b).

[4] This provision was eliminated from § 321 (a) by the Act of December 12, 1945, 59 Stat. 606, 49 U. S. C. Supp. V, § 65 (a).   Section 2 of that Act made October 1, 1946, the effective date of the amendment but provided that "any travel or transportation specifically contracted for prior to such effective date shall be paid for at the rate, fare, or charge in effect at the time of entering into such contract of carriage or shipment."

Senator Wheeler, Chairman of the Senate Committee on Interstate Commerce, who had charge of the bill on the floor, made the following statement concerning pending controversies of the nature involved in the instant cases:

"Now, Mr. President, I wish to repeat what I said a moment ago.   It should be made perfectly clear that the passage of this bill resulting in the repeal of the land-grant rates will have no effect whatever upon the controversies as to the proper classification of this material, provided it has moved prior to the effective date of the act.   These controversies, which were discussed extensively at the hearings, will have to be settled by the courts; and action on the present bill, if favorable, will have no effect whatever upon the question of whether materials that have moved prior to the repeal fall within or without the classification of military or naval property."   91 Cong. Rec. p. 9237.

lease. Accordingly, the question presented by these cases is whether the fertilizer was "military or naval property of the United States moving for military or naval and not for civil use" within the meaning of § 321 (a) of the Transportation Act.

The legislative history of the Transportation Act of 1940 throws no light on the scope of the except clause.[5] But it is apparent from the face of the statute that there are important limitations on the type of property which must be carried at less than the applicable commercial rates. In the first place, it is not the transportation of "all" property of the United States that is excepted but only the transportation of "military or naval" property of the United States. In the second place, the excepted property must be "moving for military or naval and not for civil use." Thus the scope of the clause is restricted both by the nature of the property shipped and by the use to which it will be put at the end of the transportation.

The bulk and main stress of petitioner's argument are based on the Lend-Lease Act which was enacted about six months after the Transportation Act. It is pointed out that in the case of every shipment under the Lend-Lease Act there was a finding by the Executive that the shipment

---

[5] See H. Rep. No. 2016, 76th Cong., 3d Sess., p. 87; H. Rep. No. 2832, 76th Cong., 3d Sess., p. 93. Relief from land-grant deductions was urged on the basis of the financial plight of the railroads and the substantial increase in government traffic which occurred in the 1930's. See Report of President's Committee of September 20, 1938, 1 Hearings, House Committee on Interstate and Foreign Commerce, 76th Cong., 1st Sess., on H. R. 2531, pp. 261, 271–272; Public Aids to Transportation (1938), Vol. II, pp. 42–45. The section finally enacted appears to represent a compromise between a House Bill eliminating land-grant rates entirely (see H. Rep. No. 1217, 76th Cong., 1st Sess., p. 27) and a Senate Bill which by its silence left them unchanged. S. 2009, 76th Cong., 1st Sess.

would promote our national defense,[6] that the Act was indeed a defense measure,[7] and that unless the administration of that Act is impeached, all lend-lease "defense articles" fall within the except clause and are entitled to land-grant rates.

Under conditions of modern warfare, foodstuffs lend-leased for civilian consumption sustained the war production program and made possible the continued manufacture of munitions, arms, and other war supplies necessary to maintain the armed forces. For like reasons, fertilizers which made possible increased food production served the same end. In that sense all civilian supplies which maintained the health and vigor of citizens at home or abroad served military functions.

So for us the result would be clear if the standards of the Lend-Lease Act were to be read into the Transportation Act. For the circumstance that the fertilizer was to be used by an ally rather than by this nation would not be controlling.

---

[6] The authority was vested in the President, who might, when he deemed it "in the interest of national defense," authorize the Secretary of War, the Secretary of the Navy, or the head of any other department or agency of the Government to lease, lend, etc., "any defense article." § 3 (a) (2).

[7] The Act was entitled "An Act to Promote the Defense of the United States"; and the interests of national defense were the standards governing its administration, as § 3 (a) (2), *supra*, note 6, makes plain. The same purpose is evident from the Committee Reports. H. Rep. No. 18, 77th Cong., 1st Sess., pp. 2, 11; S. Rep. No. 45, 77th Cong., 1st Sess., p. 2. And as President Roosevelt stated on September 11, 1941, in transmitting the Second Report under the Act, "We are not furnishing this aid as an act of charity or sympathy, but as a means of defending America. . . . The lend-lease program is no mere side issue to our program of arming for defense. It is an integral part, a keystone, in our great national effort to preserve our national security for generations to come, by crushing the disturbers of our peace." S. Doc. No. 112, 77th Cong., 1st Sess., p. VI.

Our difficulty, however, arises when we are asked to transplant those standards into the Transportation Act. And that difficulty is not surmounted though the exception in § 321 (a) be construed, as it must be, *Northern Pacific R. Co.* v. *United States,* decided this day, *post,* p. 248, strictly in favor of the United States.

In the first place, the Transportation Act, which preceded the Lend-Lease Act by only six months, provided its own standards. They were different at least in terms from the standards of the Lend-Lease Act; and they were provided at a time when Congress was much concerned with the problems of national defense. In September, 1940, when the Transportation Act was passed, Congress and the nation were visibly aware of the possibilities of war. Appropriations for the army and navy were being increased and the scope of their operations widened,[8] alien registration was required,[9] training of civilians for military service was authorized,[10] development of stock piles of strategic and critical materials was encouraged [11]—to mention only a few of the measures being passed in the interests of national defense. See 50 Yale L. J. 250. Moreover, the realities of total war were by then plain to all. Europe had fallen; militarism was rampant. Yet in spite of our acute awareness of the nature of total war, in spite of the many measures being enacted and the many steps being taken by the Congress and the Chief Executive to prepare our national defense,

---

[8] See, for example, Act of June 11, 1940, 54 Stat. 265, 292, 297; Act of June 13, 1940, 54 Stat. 350, 377; Act of June 14, 1940, 54 Stat. 394; Acts of June 15, 1940, 54 Stat. 396, 54 Stat. 400; Act of June 26, 1940, 54 Stat. 599.

[9] Act of June 28, 1940, 54 Stat. 670, 8 U. S. C. § 451 *et seq.*

[10] Act of September 16, 1940, 54 Stat. 885, 50 U. S. C. App. § 301 *et seq.*

[11] Act of September 16, 1940, 54 Stat. 897.

§ 321 (a) of the Transportation Act was couched in different terms. In other parts of that Act,[12] as in many other congressional enactments passed during the period, the exigencies of national defense constituted the standard to govern administrative action. But the standard written into § 321 (a) did not reflect the necessities of national defense or the demands which total war makes on an economy. It used more conventional language—"military or naval" use as contrasted to "civil" use. That obviously is not conclusive on the problem of interpretation which these cases present. But in light of the environment in which § 321 (a) was written we are reluctant to conclude that Congress meant "all property of the United States transported for the national defense" when it used more restrictive language.

In the second place, the language of § 321 (a) emphasizes a distinction which would be largely obliterated if the requirements of national defense, accentuated by a total war being waged in other parts of the world, were read into it. Section 321 (a) uses "military or naval" use in contrast to "civil" use. Yet if these fertilizer shipments are not for "civil" use, we would find it difficult to hold that like shipments by the Government to farmers in this country during the course of the war were for "civil" use. For in total war food supplies of allies are pooled; and the importance of maintaining full agricultural production in this country if the war effort was to be successful, cannot be gainsaid. When the resources of a nation are mobilized for war, most of what it does is for a military end—whether it be rationing, or increased industrial or agricultural production, price control, or the

---

[12] Thus § 1 emphasized the policy in establishing a national transportation system adequate, *inter alia*, to meet the needs "of the national defense."

host of other familiar activities. But in common par-
lance, such activities are civil, not military. It seems to
us that Congress marked that distinction when it wrote
§ 321 (a). If that is not the distinction, then "for mili-
tary or naval and not for civil use" would have to be read
"for military or naval use or for civil use which serves the
national defense." So to construe § 321 (a) would, it
seems to us, largely or substantially wipe out the line
which Congress drew and, in time of war, would blend
"civil" and "military" when Congress undertook to sepa-
rate them. Yet § 321 (a) was designed as permanent
legislation, not as a temporary measure to meet the exigen-
cies of war. It was to supply the standard by which rates
for government shipments were to be determined at all
times—in peace as well as in war. Only if the distinction
between "military" and "civil" which common parlánce
marks is preserved, will the statute have a constant mean-
ing whether shipments are made in days of peace, at times
when there is hurried activity for defense, or during a
state of war.

In the third place, the exception in § 321 (a) extends
not only to the transportation of specified property for
specified uses. It extends as well to "the transportation
of members of the military or naval forces of the United
States (or of property of such members) when such mem-
bers are traveling on official duty . . . ." That clause
plainly does not include the multitude of civilians em-
ployed by the Government during the war and exclusively
engaged in furthering the war effort, whether they be lend-
lease officials or others.[13] Thus, the entire except clause

---

[13] The provision under land-grant legislation that "troops of the
United States" should be transported at half rates was held not to in-
clude discharged soldiers, discharged military prisoners, rejected appli-
cants for enlistment, applicants for enlistment provisionally accepted,
retired enlisted men, or furloughed soldiers en route back to their sta-

contained in § 321 (a) will receive a more harmonious construction if the scope of "military or naval" is less broadly construed, so as to be more consonant with the restrictive sense in which it is obviously used in the personnel portion of the clause.

In sum, we hold that respondents in these cases were entitled to the full applicable commercial rate for the transportation of the fertilizer. In *Northern Pacific R. Co.* v. *United States, supra,* we develop more fully the breadth of the category of "military or naval property" of the United States "moving for military or naval . . . use." It is sufficient here to say that the fertilizer was being transported for a "civil" use within the meaning of § 321 (a), since it was destined for use by civilian agencies in agricultural projects and not for use by the armed services to satisfy any of their needs or wants or by any civilian agency which acted as their adjunct or otherwise serviced them in any of their activities.

*Affirmed.*

Mr. Justice Rutledge dissents.

---

tions. *United States* v. *Union Pacific R. Co., supra.* The same result was reached in the case of engineer officers of the War Department who were assigned to duty in connection with the improvement of rivers and harbors. *Southern Pacific Co.* v. *United States,* 285 U. S. 240.