**NATIONAL CARLOADING CORPORATION, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 11898.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 14, 1953.

Decided Feb. 10, 1955.

Mr. Robert E. Quirk, Washington, D. C., for appellant.

Mr. Joseph Kovner, Atty., Dept. of Justice, Washington, D. C., with whom Mr. Leo A. Rover, U. S. Atty., Washington, D. C., was on the brief for appellee.

Messrs. Edward H. Hickey, Atty., Dept. of Justice, and William J. Peck, Asst. U. S. Atty., Washington, D. C., at time record was filed, entered appearances for appellee.

Before BAZELON, WASHINGTON and DANAHER, Circuit Judges.

PER CURIAM.

Appellant complains of that part of a judgment of the District Court which dismissed with prejudice the appellant's claim for $3,015.04 for transportation of Government property. The controversy relates to 60 different bills submitted by the appellant, a freight forwarder, covering more than 300 different shipments which were made between October 1941 and January 1944. The parties stipulated that the facts as to one shipment might be deemed representative of all.

The particular subject shipment on October 7, 1941 covered 800 pounds of iron valves comprising an item of supply for the Emergency Ship Construction Program and had been purchased by the United States Maritime Commission. The shipment was transported by railroad from Pittsburgh, Pennsylvania to the Richmond Shipbuilding Corporation at Richmond, California. The parties agreed that had the Government delivered its property directly to a railroad for shipment by a route which included land-grant railroad mileage, its shipments "would have been subject to the rates or charges that would be applicable under the appropriate land-grant acts of such railroads."[1] Nor did the parties make any special determination or agreement, in regard to any of the shipments at issue, that the reduced land-grant rates would not be applicable.

Appellant's forwarding business consisted of the assembling of small shipments of freight, less-than-carload lots, and the consolidation of such shipments into mixed carloads. The rates for less-than-carload lots were substantially higher than the carload rate. Appellant initially picked up the Government's shipments by motor carrier, consolidated them with shipments in which the Government had no interest, and thereafter delivered them in carload lots to various railroads. The Maritime Commission and the War Department over the period in question delivered to the appellant various less-than-carload shipments of freight for transportation in forwarder service from points of origin east of Chicago to various destinations west of Chicago, most of them on the Pacific Coast. Appellant regularly submitted its freight voucher covering the charges due for the transportation of the Government property, and appellant's bills were paid as presented, subject to post-audit and assessment of overcharges by the General Accounting Office. Appellant paid the transporting railroads their charges

---

1. See 43 Stat. 486, 10 U.S.C.A. § 1375 which provided in pertinent part: "Payment shall be made at such rates as the Secretary of War shall deem just and reasonable and shall not exceed 50 per centum of the full amount of compensation * * * for the transportation of property or troops of the United States over any railroad which under land-grant acts was aided in its construction by a grant of land on condition that said railroad shall be and remain a public highway for the use of the United States * * * or over any railroad which was aided in its construction by a grant of land on condition that such railroad should be a post route and military road * * *." See also footnote 4, infra.

at the regular published rates, without deduction for land-grant status. In due course the General Accounting Office notified appellant of overcharges because the amounts originally paid failed to reflect the land-grant deductions from the published tariff. Deductions were thereupon made by the General Accounting Office and applied as credits toward payment of the bills now in suit.

"Congress, in most of the legislative acts by which it has made donations of the public lands to the States in which they lie for the purpose of aiding in the construction of railroads, has stipulated that the railroads so aided shall be public highways for the use of the government, free from all tolls or other charge for transportation of its property or troops." Lake Superior & Miss. R. Co. v. United States, 1876, 93 U.S. 442, 443, 23 L.Ed. 965.[2] Over the period here involved, it was provided by Section 321 (a) of the Transportation Act of 1940[3] that the Government should pay full rates for shipments over land-grant routes except for "the transportation of military or naval property of the United States moving for military or naval and not for civil use * * *."[4] In 1946 Congress abolished all reduced land-grant rates.[5]

That the shipments here in question, property of the Maritime Commission, were "for military or naval * * * use," would seem to follow from the stipulation of the parties that land-grant rates would have applied to the shipments if they had been tendered by the Government directly to the railroads. If the parties had any doubt on the point, we deem it resolved by Northern Pacific Ry. Co. v. United States, 1946, 330 U.S. 248, 67 S.Ct. 747, 91 L.Ed. 876.[6] Cf. Atlantic Coast Line R. Co. v. United States, 1954, 120 F.Supp. 917, 128 Ct. Cl. 747. The Government, therefore, claims the benefit of land-grant rates while appellant urges that whatever rights the Government might have had to such rates were surrendered when it used freight forwarder service instead of shipping by rail.

Appellant, on the other hand, says that it was not obligated to protect the Government by land-grant rates even though the Government tendered its shipments to appellant on Government bills of lading. It urges that when the Government tendered its shipments to a freight forwarder, it did so fully recognizing that forwarders provide a service different from, superior to and faster and more efficient than the service of rail carriers, that the

2. See also cases and statutes cited in Southern Pacific Co. v. United States, 1939, 307 U.S. 393, 399 note 9, 59 S.Ct. 923, 83 L.Ed. 1363.

3. 54 Stat. 954, 49 U.S.C.A. § 65.

4. "For years the land-grant rate was fifty per cent of the commercial rate and was applicable to the transportation of property or troops of the United States. 43 Stat. 477, 486, 10 U.S.C. § 1375 [10 U.S.C.A. § 1375]; United States v. Union Pacific R. Co., 249 U.S. 354, 355 [39 S.Ct. 294, 295, 63 L.Ed. 643]; Southern R. Co. v. United States, 322 U.S. 72, 73 [64 S.Ct. 869, 870, 88 L.Ed. 1144]. A change was effected by the Transportation Act of Sept. 18, 1940, 54 Stat. 898, 954, 49 U.S.C. § 65 [49 U.S.C.A. § 65]. See Krug v. Santa Fe Pac. R. Co., 329 U.S. 591 [67 S.Ct. 510, 91 L.Ed. 527]. All carriers by railroad which released their land-grant claims against the United States were by that Act entitled to the full commercial rates for all shipments, except that those rates were inapplicable to the transportation of 'military or naval property of the United States moving for military or naval and not for civil use. * * *.'" United States v. Powell, 1947, 330 U.S. 238, 240–241, 67 S.Ct. 742, 743, 91 L.Ed. 868. See also, Thompson v. Baltimore & O. R. Co., 8 Cir., 1946, 155 F.2d 767, 769, certiorari denied, 1946, 329 U.S. 762, 67 S.Ct. 122, 91 L.Ed. 657.

5. See 59 Stat. 606, 49 U.S.C.A. § 65(a).

6. "Civilian agencies may service the armed forces or act as adjuncts to them. The Maritime Commission is a good example. An army and navy on foreign shores or in foreign waters cannot live and fight without a supply fleet in their support. The agency, whether civil or military, which performs that function is serving the armed forces. The property which it employs in that service is military or naval property, serving a military or naval function." Id., 330 U.S. at pages 253–254, 67 S.Ct. at page 750.

Government did not negotiate special rates when it could have done so, and that it tendered its property for forwarding under shipping documents which failed to reveal that the Government would claim a rate deduction for land-grant rail mileage employed in the forwarding process.

The District Court resolved the issue thus posed in favor of the Government. We, too, arrive at the same conclusion.

■■ While the freight forwarder may not be considered a common carrier for every purpose,[7] it is in relation to the public which entrusts it with the shipment of goods clearly in the position of a common carrier agency [8] and is in effect now treated as such by statute.[9] Moreover, it is well established that the land-grant rebate is a charge upon the aided railroad highway and accrues not only against the owning railroad but also against others utilizing the rail highway for purposes of transportation. Lake Superior & Miss. R. Co. v. United States, 1876, 93 U.S. 442, 23 L.Ed. 965; Chicago, St. Paul, Minneapolis & Omaha Ry. v. United States, 1910, 217 U.S. 180, 30 S.Ct. 470, 54 L.Ed. 721; Astoria & Columbia River R. Co. v. United States, 1906, 41 Ct.Cl. 284.

In the Lake Superior case, supra, decided in 1876 when the land-grant acts provided that Government property would be transported "free from all tolls or other charge," the Court considered the question whether "this reservation includes the free use of the roads alone, or transportation [facilities] also." 93 U.S. at page 443. The Court concluded that the carriers were entitled to compensation for the actual transportation of Government property, but that an allowance or rebate to the Government should be made, attributable to the land-grant reservation of toll free use of the railroad, its fixtures and appurtenances. Thus to the Government was assured a "fair de-duction for the use of [the] respective railroads," Id. at page 455, even where the property was not tendered directly to the owning railroad company.

Again, in Chicago, St. P., M. & Omaha Ry. v. United States, 1910, 217 U.S. 180, 30 S.Ct. 470, 54 L.Ed. 721 the Court considered a statute permitting land-grant railroads to receive only 80 per cent of the compensation authorized by the Act for the transportation of mails. The claimant railroad transported Government mail over a route which consisted partly of land-grant roads of other companies, over its own routes, and for some distance, over non-aided routes. The Court weighed the contention that non-aided railroads had received no benefit by way of land-grant, and hence were neither within the terms nor the intendment of the statute.[10] The Court held that the power reserved to Congress was over the property, rather than over the companies which owned it, and extended to every use of it, whether by the owning companies or any company which received a right from them. "If a difference in degree of use, or a participation in the use by other companies than the aided ones, had been intended, it would have been expressed. * * * As we have already said, the obligation is either upon the aided companies, to be enforced by remedies against them, or it is on the property as well; and if upon the property, *necessarily on it by whatever company or person it is used.*" (Emphasis supplied.) Id., 217 U.S. at page 188, 30 S.Ct. at page 473.

■ Both the Lake Superior and Omaha cases demonstrate that the concessions retained by Congress in favor of the Government apply to the property or railroad highway over which the goods are hauled, and not to the aided companies alone. The land grant acts accordingly were not limited in their application to situations in which the Gov-

---

7. See Chicago, M., St. P. & P. R. Co. v. Acme Fast Freight, Inc., 1949, 336 U.S. 465, 69 S.Ct. 692, 93 L.Ed. 817.

8. See Freight Forwarding Investigation, 229 I.C.C. 201, 298-9 (1938).

9. 56 Stat. 284 (1942), 49 U.S.C.A. § 1001 et seq.

10. Appellant argues to the same effect in the instant case.

ernment tendered its shipments directly to the railroads or those in privity with them. Thus the Government retained for itself a right to pass its own goods at a reduced rate whenever the granted railroad route was used in their transportation.

 Coming then to a consideration of the applicable statute, cited and quoted in note 1, supra, we find that it imposed the rate reduction in connection with the transportation of all military property of the United States by rail over land-grant roads regardless of how transportation is arranged. It did not limit the duty to grant the rate reduction to railroad companies only but ordered in broad language that all military Government property should be transported at the reduced rate. In consequence, the statute on its face bound every person who transported military Government property over a land-grant aided railroad regardless of whether it was the railroad company itself or an intermediary, such as a freight forwarder, whom the Government entrusted with the shipment of its goods. The rate charged by a freight forwarder for the shipment of military Government goods, therefore, had to reflect the rebate to which the Government is entitled whenever such goods were shipped over the tracks of a land-grant aided railroad.[11] In our view the foregoing considerations dispose of the case, and we do not reach the remaining contentions of the parties.

The judgment of the District Court is accordingly

Affirmed.

DANAHER, Circuit Judge (concurring in the result).

I do not agree that the statute *ipso facto* entitled the Government to the reduced rate "regardless of how transportation is arranged." My colleagues decide the question without reference to the shipping documents while I believe that without them the freight forwarder might have been entitled to recover. There is no question—indeed it is here conceded—that had the goods been tendered directly to the railroad, land grant rates would apply. "All of the reported cases of which we are advised involve a dispute between the government and a carrier as to the application of such rates."[1]

The reason is clear enough. "The carrier's obligation to haul property of the United States at reduced rates was a part of the consideration for which the land grant was made. Part of appellant's compensation for hauling the coal was paid in land, and the balance was paid in money."[2] This forwarder received no such emolument by land grant—it did not receive half its pay in land, half in money. On the contrary, as a freight forwarder it picked up the government's small shipments in its own trucks, took them to its loading point, assembled them with other non-government shipments into full carloads, gave them expedited shipping service across the country, became liable for losses and damage in transit, delivered them to itself at its freight terminals in any one of ninety cities throughout the nation, unloaded the cars and then delivered each individual shipment by its own truck at the point of destination. Without more, it would seem utterly unconscionable to say that this superior expedited service was to be performed at land grant rates. Indeed, the government itself as experience developed the need during the war, specifically contracted to pay full rates for such and extra services when a shipment was stamped to show an administrative determination that freight forwarder service was required. Even then the government received from the forwarder all necessary data to permit the government to seek

---

11. Nothing herein is intended to reflect on the question of liability of the railroad companies involved to plaintiff; that question is not now before us.

1. Henry H. Cross Co. v. United States, 7 Cir., 1943, 133 F.2d 183, 186.

2. Louisville & Nashville R. Co. v. United States, 1925, 267 U.S. 395, 402, 45 S.Ct. 233, 236, 69 L.Ed. 678.

land grant deductions *from the railroads.* The exhibits of record make this situation crystal clear. Moreover it is not unreasonable to deduce that the special agreements referred to, effective September 14, 1942, February 24, 1943 and June 24, 1943, respectively, were intended to clarify and resolve a state of confusion borne of the volume of shipments and the peculiar and extraordinary character of the freight forwarder's status.

What then, of situations such as the present, stipulated to be representative of hundreds, not within the special agreements mentioned or antedating them, or completed prior to the adoption of the Freight Forwarder Act in 1942?[3] We must resort to the shipping documents for our answer.

The shipment moved on government bill of lading throughout, so far as relations between the Government and appellant are concerned, even though as to the railroads the latter was a shipper and not a carrier. Chicago, M., St. P. & P. R. Co. v. Acme Fast Freight, 1949, 336 U.S. 465, 69 S.Ct. 692, 93 L.Ed. 817. "But the mere use of government forms of bills of lading is not conclusive on the question of ownership of property at the time of transportation, and does not give the United States the right of transportation at land grant rates."[4] Certainly the manufacturer could not have received land-grant rates had it shipped the valves on government bill of lading.[5] And not every purchase which furthers national defense is for "military or naval" use within the meaning of the applicable statute.[6]

Here the government bill of lading specifically identified the valves as public property and directed the forwarder to bill the "U. S. Maritime Commission Emergency Ship Construction Fund, Division of Purchase and Supply." Here the shipment was clearly consigned to the "U. S. Maritime Commission, Richmond Shipbuilding Corp. via National C/L." Here the receipt for delivery at Richmond, California, by "National Carloading Corp." demonstrated that the entire transportation was accomplished by the forwarder. Here the public transportation voucher form addressed to "The United States, Dr." by "National Carloading Corporation" bore the latter's certificate "that the above account is correct and just, that the services have been rendered as stated * * * and that the rates charged are not in excess of the lowest net rates available for the Government, based on tariffs effective at the date of service."

Appellant as "an experienced carrier could not have been unfamiliar with the express terms of a document which it uses regularly, a prescribed document upon which every claim against one of its largest customers must be made."[7]

Nor could the appellant have failed to know that since 1921 the Comptroller General had ruled that freight forwarders are subject to land grant rates. See 27 Comp.Dec. 1043. Moreover by a ruling of March 16, 1938, the Comptroller General had specifically advised appellant of the Government's claim of right to land grant deductions. It therefore was not open to appellant to certify that "lowest net rates" meant the rates it had prescribed for expedited service without deduction. There was no express agreement that the shipments in suit were based upon appellant's forwarder's tariff, nor a showing that government officials knew of, or expected the government would pay, the forwarder's rate. Thus,

3. 49 U.S.C.A. § 1001 et seq.

4. Louisville & Nashville R. Co. v. United States, 1925, 267 U.S. 395, 398, 45 S.Ct. 233, 235, 69 L.Ed. 678; Pacific Ry. Co. v. United States, D.C.Cal.1947, 71 F.Supp. 987, 989, affirmed 9 Cir., 1949, 172 F.2d 222.

5. Henry H. Cross Co. v. United States, 7 Cir., 1943, 133 F.2d 183; Louisville & Nashville R. Co. v. United States, supra, 267 U.S. at page 401, 45 S.Ct. at page 236.

6. United States v. Powell, 1947, 330 U.S. 238, 67 S.Ct. 742, 743, 91 L.Ed. 868.

7. Alcoa S.S. Co. v. United States, 1949, 338 U.S. 421, 429, 70 S.Ct. 190, 94 L.Ed. 225.

there can be no recovery on the theory of implied contract.[8]

In short, as I see it, the shipping documents made clear to the appellant the character of the shipment within the applicable statute, that title was in the Government, that the Government became entitled to land-grant rates, that the proper charges should reflect the appropriate deductions and that appellant was not entitled to payment in amounts greater than could be certified to be the lowest net rate for the Government. The voucher meant that much, at least. On post-audit accordingly, the Government was justified in withholding amounts equal to earlier overpayments, and the judgment of the District Court was correct.

8. Southern Pacific Co. v. United States, 1926, 272 U.S. 445, 447, 47 S.Ct. 123, 71 L.Ed. 343.