**CHICAGO AND NORTH WESTERN RAILWAY COMPANY**

v.

**The UNITED STATES.**

**No. 48787.**

United States Court of Claims.

Jan. 11, 1955.

Jordan J. Hillman, Chicago, Ill., for plaintiff. Fred O. Steadry and Drennan J. Slater, Chicago, Ill., were on the briefs.

Gordon F. Harrison, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

James H. Falloon, Jr., Washington, was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LARAMORE, Judge.

Plaintiff sues to recover the difference between the land-grant freight rates paid on coal delivered by rail to defendant between 1942 and 1945, inclusive, and the same rates computed without benefit of land-grant deduction.

At various times during 1942, 1943, 1944 and 1945, plaintiff, a non-land-grant

railroad, in participation with other railroads, transported for defendant numerous carload shipments of coal from several Old Ben Coal Corporation mines located in the vicinity of Christopher, Illinois, to government installations in Wisconsin and Illinois. Plaintiff, as the final and delivering carrier responsible for the collection of the freight charges, submitted to defendant its bills for the transportation in question in the total amount of $162,328.10 without deductions for land-grant, and the amount so billed was paid by defendant. Subsequently, defendant decided that the freight charges should have been computed at net land-grant rates and accordingly deducted $32,705.89 from bills rendered by plaintiff for other transportation services, in order to adjust the prior payments to the land-grant rate basis.

Plaintiff and its participating carriers had on file with the Quartermaster General of the War Department a freight land-grant equalization agreement whereby the carriers agreed:

> " * * * to accept for transportation of property shipped for account of the Government of the United States and for which the Government of the United States is lawfully entitled to reduced rates over land-grant roads, the lowest net rates lawfully available, as derived through deductions account of land-grant distances from the lawful rates filed with the Interstate Commerce Commission * * * applying from point of origin to destination at time of movement."

Commercial shipments of coal from a number of the Old Ben Coal Corporation mines, including Mine No. 11, located in the vicinity of the town of Christopher, Illinois, were governed by the Chicago, Burlington and Quincy Tariff, I.C.C. No. 19670, C. B. & Q. G. F. O. 15000–E, and supplements thereto. Although the coal was actually shipped from the mines by loading the coal at the mines on cars located on spur tracks of whatever railroads served the mines, the tariff showed but one point of origin for such shipments, and that point, for rate making purposes, was Christopher, Illinois. The town of Christopher itself was served by the Chicago, Burlington and Quincy Railroad, a non-land-grant railroad which, with plaintiff, participated in the transportation of the shipments of the coal here involved. Christopher was also served by the Illinois Central Railroad, a land-grant line. At the town of Christopher there are no track connections between the two railroads.

A number of the Old Ben Coal Company mines in the vicinity of Christopher and carrying the Christopher freight rate on shipments therefrom, are served by both the land-grant Illinois Central Railroad and by the non-land-grant Chicago, Burlington and Quincy Railroad. This was true of Old Ben Coal Company Mine No. 14, and the parties agree that any shipments from that mine via the non-land-grant road should be billed at land-grant rates in accordance with the terms of the equalization agreement to which the Chicago, Burlington line was a party.

Old Ben Coal Company Mine No. 11, located in the vicinity of Christopher and carrying the Christopher rate on shipments therefrom, was served only by the non-land-grant Chicago, Burlington and Quincy Railroad. The land-grant Illinois Central did not have access to this mine and there was established in the applicable freight tariff no switching arrangement by which the land-grant line could transport coal from Mine No. 11. For four years, 1942–45, inclusive, all shipments from Mine No. 11 were billed to the Government at full commercial rates. Shipments from Mine No. 14, which was served by both railroads, were billed at land-grant rates although the shipments actually moved via the non-land-grant road. The through commercial freight rate on coal from these mines taking the Christopher rate, via the land-grant road of the Illinois Central Railroad, to the destinations involved in this case, was the same as via the lines of the plaintiff railroad and its participating carrier, the non-land-grant Chicago, Burlington

and Quincy Railroad, to the same destinations. The freight charges under the equalization agreement were computed at net land-grant rates via the land-grant route and not over the actual route of movement.

The dispute arose in connection with shipments to the Government from Mine No. 11. It is plaintiff's position that under a proper construction of the equalization agreement it was not obligated to transport coal for the Government from that mine at land-grant rates because, at that mine, the Government had no actual choice of shipping via land-grant or non-land-grant road, and must ship, if at all, via the non-land-grant line. Plaintiff says that the purpose of the equalization agreements was to give the non-land-grant railroads a share of the Government business, and to give the Government a larger choice of shipping facilities at land-grant rates, at points of origin served by *both* land-grant and non-land-grant roads; that where a particular point of origin, such as Mine No. 11, was served only by a non-land-grant railroad and there was no possibility of the shipment moving via land-grant route, the non-land-grant carrier was not obligated under the agreement to give the Government land-grant deductions.

Defendant does not urge that at Mine No. 11 the coal could have been shipped via a land-grant road nor that there were any switching arrangements or track connections between the non-land-grant road serving the mine and the land-grant road which served the town of Christopher. Defendant contends, however, that the physical impossibility of shipping the coal via a land-grant road from the actual point of origin of the shipment, does not relieve the non-land-grant carrier from the obligation of billing the Government at land-grant rates because the "point of origin" of this shipment as set forth in the applicable Chicago, Burlington and Quincy tariff, was Christopher, Illinois, and not Mine No. 11. It is defendant's position that the phrase "point of origin" used in the equalization agreement, refers to the "point of origin" named in the applicable tariff even where, as here, the tariff point of origin, *i. e.*, Christopher, was the shipping point for rate making purposes only and not the actual place at which the shipment originated.

In order to resolve the issue in this case, we must determine the meaning of the phrase "point of origin" as it is used in the Federal land-grant equalization agreement. As pointed out by plaintiff, a disputed term or phrase in a contract should be given a meaning which will effectuate the dominate purpose of the contract. Cities Service Gas Co. v. Kelly-Dempsey Co., 10 Cir., 111 F.2d 247; Marx v. American Malting Co., 6 Cir., 169 F. 582, 584; Legal Tender Cases, 12 Wall. 457, 79 U.S. 457, 20 L.Ed. 287.

In Southern Ry. Co. v. United States, 100 Ct.Cl. 175, the court made the following finding regarding the purpose of the freight equalization agreements:

"3. The purpose and effect of the freight equalization agreements of the defendant with plaintiff and with other common carriers was to equalize rates on Government property over various routes serving the same point of origin and destination, where one or more of those routes had been aided in whole or in part by grant of public lands, rates over all routes from point of origin to destination being brought down to the level of that over the route producing the lowest net rate on account of land-grant deduction.

"This arrangement was designed to give the equalizing carrier a portion of the Government business *that was possible of routing over the governing land-grant route,* and to give the Government a greater range in choice of routes where considerations of economy entered into the selection. 100 Ct.Cl. at pages 177, 178." Italics supplied.

The above finding was quoted with approval by the Supreme Court in its decision affirming, 322 U.S. 72, 64 S.Ct. 869, 88 L.Ed. 1144, the decision of the

Court of Claims. In that case the plaintiff, a carrier by rail and a party to an equalization agreement, contended that it should not have to grant the United States land-grant deductions on livestock shipments over its road because, although transportation via a land-grant road was actually possible from the place where the shipments originated, the land-grant route was so circuitous that it would have been improvident and uneconomical for the Government to have shipped livestock via it. In summarizing the carrier's arguments, the Supreme Court had the following to say:

> "It is argued, moreover, that the equalization agreement properly construed requires petitioner to equalize rates computed by land-grant routes which are competitive for government traffic. Its purpose, according to that contention, was to secure for petitioner traffic which in its absence would be *likely* to move over competing land-grant routes, as distinguished from traffic which was *possible* of routing over the cheapest land-grant route." 322 U. S. at page 75, 64 S.Ct at page 871. Italics supplied.

The Supreme Court held, as did the Court of Claims, that the fact that in a given case the shipment *probably* would not have been shipped over the land-grant route, was immaterial, and that if it was *possible* for the shipment to move over a land-grant route, the party to the equalization agreement was obligated thereby to transport the Government's property at land-grant rates. Inasmuch as it was possible, at the physical point of origin of the shipments involved in that case, for the Government to have shipped via a land-grant route, it was held that the Government was entitled to the land-grant deduction.

In the Southern Railway case, supra, and in others to which the parties have referred us, the courts appear to have assumed that the phrase "point of origin" used in the equalization agreements, meant the actual place from which the shipment was made, and if at that place the Government had an actual opportunity of shipping its property via a land-grant route, no matter how impractical or improbable, the courts have held the Government entitled to land-grant rates.

In the instant case, the shipments in question did not originate in the town of Christopher which was admittedly served by both land-grant and non-land-grant roads. The shipments originated at Mine No. 11 outside the town of Christopher, and the only means of transportation available to a shipper of coal from that mine was via a non-land-grant railroad. The record indicates no possible means by which coal from Mine No. 11 could have been loaded on cars of the Illinois Central, the land-grant road, and there appears to be no basis in the facts of this case for applying the terms of the land-grant freight equalization agreement to shipments from this mine.

Defendant suggests that it was entitled to rely on the town of Christopher as being the point of origin of the shipments from Mine No. 11 because Christopher was named in the applicable tariff as the "point of origin." Defendant contends that had the Government procurement officers known that shipments from Mine No. 11 would not be covered by the equalization agreement and would be billed at the full commercial freight rates, they would have ordered all shipments of coal to be made from Mine No. 14 which was served by both the land-grant road and the non-land-grant road. The record does not furnish a basis for defendant's assumption. For approximately four years shipments of coal had been made for the Government from both mines and the Government had paid for such shipments at the full commercial rate from Mine No. 11 and at the reduced land-grant rate from Mine No. 14. Although the applicable tariff for both mines designated Christopher as the point of origin for rate making purposes, and the rates would have been the same except for the land-grant deduction granted on Mine No. 14 shipments, the Government made

no objection to paying the full rate from Mine No. 11. It hardly seems likely that the Government officials were unaware that they were paying a higher rate on coal shipped from Mine No. 11 than on coal from Mine No. 14. Their failure over this long period of time to discontinue ordering coal from Mine No. 11 and to concentrate all such orders at Mine No. 14 could not have been due to the fact that they supposed they were entitled to the same freight rates on shipments from both mines.

The freight land-grant equalization agreements have been construed most strictly in favor of the Government by the courts, and parties to the agreements have been required to equalize their freight rates wherever there was any possibility that the Government as a shipper could ship its property over a land-grant route. That the use of the accessible land-grant road by the Government was, for any reason, highly improbable, did not exempt the non-land-grant road from the duty of equalizing its rates. This interpretation of the agreement seems to us to be in harmony with the underlying purposes of the agreement. On the other hand, to require, as defendant urges herein, that a non-land-grant road equalize its rates on Government shipments that could not be moved via a land-grant road, would be an unwarranted broadening of the application of the agreement.

We think that on the basis of the facts in the instant case, Old Ben Coal Mine No. 11 was the "point of origin" of any coal shipments from that mine within the meaning of the phrase "point of origin" as used in the equalization agreement since the coal could not have been shipped from Christopher, the place named as the point of origin in the applicable tariff. Accordingly, because there was no possible way for the Government to ship its coal from Mine No. 11 except via the non-land-grant road, it was not entitled to land-grant deductions from the commercial freight rates on shipments from that mine.

Plaintiff is entitled to recover the difference between the full commercial freight rate and the land-grant rate on all shipments originating at Mine No. 11.

During the course of the hearing it developed that some of the shipments claimed may have originated at Mine No. 14 which was accessible to the land-grant line of the Illinois Central as well as to the non-land-grant line of the Chicago, Burlington and Quincy Railroad. Plaintiff concedes that on shipments originating at Mine No. 14 the Government is entitled to the land-grant deductions. Accordingly, entry of judgment for plaintiff will be suspended pending the filing of a statement showing the amount of coal shipped from Mine No. 11 and the correct amount due on such shipments.

It is so ordered.

MADDEN and LITTLETON, Judges, concur.

WHITAKER, Judge (dissenting).

The tariff covering the shipments of coal in this case covered the shipment from Christopher to the points of destination. Christopher was the "point of origin," insofar as the tariff is concerned. The mine was not the point of origin, so far as the tariff was concerned. There was no tariff covering a shipment from the mine to the points of destination. The mine was no more the point of origin than a factory in the city of Washington or other town which is served by a spur track, whether the factory is located within or outside of the city limits. Washington is the point of origin.

Since we are concerned with the freight collectible under the tariff on file with the Interstate Commerce Commission, we must treat this shipment, it seems to me, as one originating in the town of Christopher. Then, since Christopher was on a land grant road, it seems to me that any shipment from Christopher would take the land grant deduction.

JONES, Chief Judge, concurs in the foregoing dissent.