it would "thereupon" become a binding contract. This it would seem clinches the correctness of our interpretation.

The interpretation reaches the ends of justice for all parties. It preserves the definite time at which acceptance becomes final and does so in full accord with the changed regulation.

Manifestly a mistake was made. The defendant is not injured by permitting its correction. It only forbids defendant's unjust enrichment by preventing its taking technical advantage of an evident mistake.

Plaintiff is allowed to recover its actual losses, if any, in furnishing the machine bolts, limited, however, to the difference between its bid and that of the next lowest bidder on these particular items, that amount being not a yardstick, but a ceiling on any losses it may be able to prove; or, in the alternative, the reasonable value of the items furnished, subject to the same limitation.

The case is remanded to a commissioner of this court for the purpose of hearing evidence as to such losses, if any, or as to the reasonable value of the items furnished.

It is so ordered.

LARAMORE and LITTLETON, Judges, concur.

WHITAKER, Judge (dissenting).

I think a binding contract was made in this case. I shall state my reason for this opinion very briefly. The invitation for bids asked the bidders to state the time the bid would remain in effect. The bidder stated it would remain in effect 20 days. This was a binding agreement. The bid could not be withdrawn within that time in the absence of fraud or mistake, but the mistake must have been mutual. The plaintiff admits this in its brief. A mutual mistake would invalidate plaintiff's agreement to hold his bid open for 20 days, but a unilateral mistake will not.

There were wide variations in the bids on the several items covered by the invitation. In the circumstances there was nothing to put the contracting officer on notice that the plaintiff had made a mistake.

For these reasons I dissent.

MADDEN, Judge, concurs in the foregoing dissent.

**GEORGIA SOUTHERN & FLORIDA RAILWAY COMPANY**

v.

**The UNITED STATES.**

**No. 50227.**

United States Court of Claims.
Feb. 8, 1955.

Seddon G. Boxley, Washington, D. C., for plaintiff.

John R. Franklin, Washington, D. C., Warren E. Burger, Asst. Atty. Gen., Alfred J. Kovell, Paxinos, Pa., on the brief, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

JONES, Chief Judge.

The question is what rates should apply to shipments of troops and equipment on coach-freight military trains from Camp Blanding, Florida, to Camp Forrest, Tennessee.

During the months of March, May and June 1943, plaintiff and connecting carriers operated 45 special coach-freight military trains between the points mentioned, carrying a total of 13,556 officers and enlisted men and military property.

Several different routes were available. An equalization agreement was entered into by the terms of which the carriers agreed to accept for the transportation of persons rates to be determined as set out in the agreement. Pertinent parts of this agreement are set out in finding 4.

The agreement stipulated that the rate should be determined by the usually traveled route for military traffic at the time of movement, and that the usually traveled route for the determination of the rate should be that over which it would be practicable and economical to actually route the special car, or special train military traffic. The agreement further stated that the "usually traveled route for military traffic" should in the first instance be construed by the administrative officers of the military branches of the United States Government.

The plaintiff billed the Government on the basis of a net coach fare of $11.38 per person. The defendant declined to pay on this basis, claiming that the rate should have been $9.16 per capita, as measured by a different and longer route. The longer route would have produced a lower rate because of the fact that it would have been a land-grant shipment all the way.

The map which is set out in one of the exhibits shows that there were five routes from Camp Blanding, Florida, to Camp Forrest, Tennessee. The shortest rail connection between the two points is 588 miles, by what is known as the Southern route; another, by what is known as the Everett route, is 599 miles; another, by the Seaboard route is 667 miles, while what is known as the Savannah route is 697 miles. The route for which the defendant contends, which was known as the Pensacola route, is 921 miles long.

Pursuant to the terms of the equalization agreement that what constituted the usually traveled route for military traffic should in the first instance be construed by the administrative officers of the military branches of the United States Government, Col. E. B. Gray, Chairman of the Usually Traveled Route Committee, on September 25, 1950, wrote the Chairman of the Southern Passenger Association in reply to a letter with respect to the movement of the troops involved as follows:

"1. In reply to reference (b), you are advised that in the opinion of the Usually Traveled Route Committee, the route from Camp Blanding (Theressa), Fla., to Camp Forrest (Tullahoma), Tenn., via SAL, Chattahoochee, L&N Nashville, thence NC&StL, was not a usually traveled route, for special train (coach) military traffic in March 1943."

A similar letter was written by Colonel Gray in connection with a later shipment.

Both of these letters were in reference to the Pensacola route and both definitely ruled that it was not a usually traveled route for coach military traffic. Thus the Army officers, familiar with actual operations, and who had been specially commissioned to determine the matter in the first place, decided on both occasions adversely to the contention here made by the defendant.

The General Accounting Office, however, determined that the Government should have had the benefit of the so-called Pensacola route and deducted from the total amount the difference between the two rates.

The issue turns on whether or not the longer route known as the Pensacola route was a practicable and economical route over which to transport the troops by mixed train.

The record shows that such mixed coach-freight trains had never been run for military transportation from Camp Blanding, Florida, to Camp Forrest, Tennessee, over the Pensacola route, nor were any of the shipments involved in this case so transported.

The plaintiff agreed to accept the lowest rate that could be determined by using any one of the four other routes and it thus billed its accounts on the basis of the lowest of those rates. While there were no actual schedules for mixed coach-freight military trains over the Pensacola route, we find from the various estimates that the actual running time for that route would have been 44 hours and 15 minutes, while the running time over the Southern route was 29 hours and 15 minutes, and over the Everett route 31 hours and 45 minutes.

To have used the Pensacola route would have resulted in an unnecessary expenditure of equipment, fuel and crews. Due to the changes on the more circuitous route it would have required more crews and more engines for each train. It would have resulted in delay in transit due to the longer running time and would have placed further stress on the coaches which were urgently needed by the rail-

roads during the war period. In addition, if the more circuitous Pensacola route had been used for the transportation, it would have been necessary under the operating rules of the carriers to return the trains by the same route and this would have further delayed the movement and further complicated the shortage of rolling stock during that period.

The Army disliked to keep soldiers traveling by coach on the train more than one night in succession. It would have been necessary, if the longer route had been used, to keep them on the train two successive nights. In all the circumstances we find that it was not "practicable and economical to actually route" the special car or special train military traffic over the Pensacola route. As a matter of fact, the Pensacola route was not even suggested nor considered by the participating railroads or the transportation officers of the Army as a practicable route for such traffic and was never used for traffic of the character here involved.

The defendant cites the case of the Southern Railway Co. v. United States, 322 U.S. 72, 64 S.Ct. 869, 88 L.Ed. 1144. However, that case involved a freight rate land-grant equalization agreement which was worded very differently from the passenger equalization agreement here involved. In that case the railroad agreed to accept the lowest net rate "lawfully available" and both this court and the Supreme Court held that the longer route was lawfully available. In other words, the Court held that the Government could use any rate-making route it chose.

In the case at bar, however, the agreement requires the carrier to accept the lowest net fare, applying any land-grant route recognized as a "usually travelled route for military traffic." It then defined that term by saying that it must be a route that is both practicable and economical. The Supreme Court in the case just cited recognizes this distinction between the two classes of agreements.

We quote from the Court's opinion in 322 U.S. at page 77, 64 S.Ct. at page 872:

"At times the United States has *made equalization agreements which* were more favorable to the equalizing carriers than the instant one appears to be. Thus in 1917 a passenger land-grant equalization agreement was made with petitioner and other carriers whereby they agreed to accept the lowest net fare 'lawfully available, as derived, through deductions account land-grant distance *via a usually traveled route for military traffic,* from a lawful fare filed with the Interstate Commerce Commission as applying from point of origin to destination via such route at time of movement.' (Italics added.) That agreement suggests that when the United States desired to give equalizing carriers more favorable rates than the lowest rates to which it was lawfully entitled on land-grant routes, it chose apt words to express its purpose. It also gives added significance to the omission of any such qualification in the present agreement. It suggests that if we read into the agreement the qualification which the petitioner desires, we would remake the contract."

As stated by the Supreme Court in the above quotation, to sustain the defendant's contention we would be required to remake the contract. The limitations set out in the equalization agreement in the case at bar would be entirely removed and the Government could choose any route it saw fit, regardless of the expense, regardless of its practicability and regardless of its economical use. We do not believe the equalization agreement here involved is open to any such construction.

It was stipulated at a pretrial conference that in the event the court decided the Pensacola route could not be used for rate making in this case, then the lowest rate available to the Government was $11.38 per person, this being the lowest rate for transportation of this character over any of the four available routes.

The plaintiff is entitled to recover the sum of $30,094.32.

It is so ordered.

LARAMORE, MADDEN, WHITAKER and LITTLETON, Judges, concur.